## IN RE PETERSON'S ESTATE.

## DAVIDSON v. UNKNOWN HEIRS OF PETERSON et al.

(134 N. W. 751.)

**Appeal — defective undertaking — jurisdiction to permit filing of new undertaking.**

1. After an appeal from county to district court has within time been perfected by the service of a notice of appeal upon some of the parties litigant, and where a fatally defective undertaking on appeal has seasonably been filed in a good-faith endeavor to perfect such appeal, the county court, under § 7969, Rev. Codes 1905, has jurisdiction of an application based on an affidavit showing such good faith and explaining the default to permit appellant to file a new and sufficient undertaking in lieu of the defective one.

**Appeal — defective undertaking — remanding for purpose of filing new undertaking.**

2. Where the record on such an appeal has been transmitted to the district court and a motion is there made to dismiss the appeal for want of a legal undertaking, it is held that the requirement of a valid undertaking to be served and filed as a step in the appeal proceedings is primarily for the purpose of security, and as such the filing of an insufficient or void appeal bond with the notice of appeal vests the district court with jurisdiction to order the record to be remanded to the county court that a sufficient bond on appeal may be here approved and filed and the record retransmitted to district court.

**Appeal — trial de novo — evidence.**

3. Where such notice of appeal demands a trial *de novo* and the retrial involves issues of both law and fact, as the determination of the existence of a foreign common-law marriage necessarily to be determined from evidence, it is triable on evidence to be offered anew and not on the record or transcript of testimony and proceedings certified from county court; and the last part of § 7985, is not to be construed as denying or limiting the manner of trial *de novo* in such cases to a review of the record of the lower court.

**Appeal — trial de novo — procedure.**

4. Such an issue is one triable in district court as an equitable action where a jury trial is not had.

Note.—The holding in this case that entries of births, deaths, and matters of family history in a family Bible are admissible in evidence is in harmony with the general rule, as shown by a review of the authorities in a note in 41 L.R.A. 449, in which the whole subject of entries in family Bible or other religious book as evidence is treated.

**Appeal — trial de novo — procedure — legal or equitable.**

5. Where so tried to the court, the record and the proceedings on appeal from the district to the supreme court are governed by the statutes as to appeals in equitable actions. Where a jury is had in the district court, the appeal therefrom is governed by appeals from jury trials, following Hedderich v. Hedderich, 18 N. D. 488, 123 N. W. 276.

**Appeal — trial de novo — probate matters — constitutionality of statute as to.**

6. The statute vesting in the district court jurisdiction to try *de novo* probate matters appealed from county court is not unconstitutional as violating § 111 of the Constitution, granting exclusive original jurisdiction to the probate court of such class of actions, as the trial *de novo* on appeal is but the exercise by the district court of the appellate jurisdiction conferred by statute and permitted by § 103 of the Constitution.

**Appeal — statement of case.**

7. The settled statement of the case on appeal from district to this court from the determination of an equitable issue as in this action should include only the proceedings had in the district court trial.

**Common-law marriage — sufficiency of proof.**

8. The evidence offered in district court on behalf of respondents Miesen is reviewed and held to negative the existence of any common-law marriage of Dorothea Harnau to Peterson. Neither she nor Herman Miesen, alleged son of deceased, are entitled to inherit his estate. They are without interest in these proceedings, and their petition that his estate be decreed to them on final distribution thereof is denied and judgment below in their favor is ordered vacated.

**Evidence — entry in family Bible.**

9. Entries of births, deaths, and matters of family history in a family Bible, though hearsay, are admissible as past declarations of matters of family history concerning events as to which the family is presumed to have accurate knowledge, when the entries were made by a member of the family since deceased, or at a time when there could exist no motive to deceive.

**Evidence — certified copies of parish records from foreign country.**

10. Certified copies of parish records from Norway of recorded births, deaths, and marriages, tending to establish respondents Ladehol et al. to be heirs of deceased, held inadmissible for want of proof as a foundation for their admission of the foreign law requiring such registration as an official duty. A foreign law relied upon as the basis for such testimony must be proven as a fact, and when the foreign law exists as a statute or in writing, oral testimony thereof is inadmissible under both the common law and our statute, § 7291. The foreign unwritten or common law may be established by oral testimony, but where such oral testimony does not establish the foreign law to exist as unwritten or common law and negative the existence of a written statute, the

22 N. D.—31.

proof of the foreign law is insufficient to admit certified copies of the foreign official but nonjudicial records.

**Evidence — certified copies of parish records from foreign country — authentication.**

11. Such certified copies purported to be certified by the pastors as keepers of the records, authenticated under seal by district judges as to genuineness of the pastors' signatures and that the records were kept pursuant to requirements of law, and reauthenticated by higher church officials, and all certified under seal of office as to verity of signatures, faith, and credit to be given and as made under lawful authority in turn by the American consul resident in Christiania, Norway, held insufficient to warrant the reception in evidence of such documents so certified without further proof that the foreign law was not in writing.

**Evidence — documentary — authentication — foreign nonjudicial records.**

12. The Federal, state, and common-law rules of authentication of documentary evidence as between the states and territories discriminated, the common-law rule as to proof necessary to admit foreign official, but nonjudicial records not applying thereto.

**Appeal — remanding for retrial.**

13. The proof of heirship being insufficient as to the right of Ladehol et al., alleged foreign heirs, respondents, to inherit, but it appearing that on retrial further testimony might be offered and that further opportunity should be given them to submit proof of their relationship to deceased, this action is remanded to the district court for retrial on that issue, and the state, to whom in case of want of heirs the estate escheats, will appear by the state's attorney of Benson county or the attorney general. Judgment in the county court to be entered on order of district court.

Opinion filed January 11, 1912.  Rehearing denied February 19, 1912.

Appeal from the District Court of Benson county; *Cowan,* J. Reversed and remanded.

*Scott Rex, T. H. Burke,* and *C. L. Lindstrom,* for appellants.
*Buttz & Sinness* and *O. D. Comstock,* for respondents.

Goss, J.   This action arises over the estate of Anton Emil Peterson, deceased.   The appellants, Ladehol et al., claim to be blood relatives of Peterson through his mother, deceased having been an illegitimate son.   Appellants all reside in Norway, and rely wholly on documentary proof of the antecedents of the deceased and of their relation to him.

Deceased died intestate, unmarried, and at his death was, and for twenty years prior thereto had been, a resident of Benson county. His estate, awaiting final decree of distribution, after payment of all debts and expenses of administration, has been reduced to money and amounts to over $6,000, in the hands of the administrator, respondent, and subject to further order of court. The respondents Dorothea Miesen and Herman Miesen claim to be the common-law wife and son respectively of deceased. They reside in Michigan, in which state they aver such marriage occurred in 1876 or 1877. She claims to have been deserted by deceased in 1878, since which time she and Peterson have never met. She remarried in 1879 to Miesen, her present husband, to whom she has since born five children. On the presentation to the county court of Benson county of the administrator's petition for final distribution of the proceeds of the estate to the legal heirs of the deceased, joinder of issue was had between the administrator, the state acting by the state's attorney of Benson county, respondents Miesen (alleged common-law wife and son of deceased), and Ladehol and nineteen other foreign heirs appearing by guardian and attorneys in these proceedings. In the county court hearing was had on depositions; so also in district court except oral testimony as to a few matters regarding which resident witnesses could testify. The decision of the county court was adverse to these appellants, who served and filed within time the proper notice of appeal therefrom to the district court, and seasonably served and filed a bond fatally defective in parties, amount, and conditions. In the face of a motion made in district court to dismiss the appeal and affirm the judgment of the county court for want of jurisdiction of the district court because of such defective undertaking on appeal, on application of appellants the record was transmitted to the county court, with directions to permit appellants to file such new undertaking as should meet with the approval of the county court, conditioned on its return within a limited time duly certified back to the district court. Complying therewith, appellants filed a new bond on appeal, regular in all particulars and approved by the county judge and transmitted by him to the district court, where jurisdiction was assumed over objection; and trial *de novo* was then had, no jury having been demanded. The cause was heard as triable in equity and the record made accordingly with no testimony excluded. At the close of

the case the court made its findings and conclusions, in favor of respondents Miesen for judgment dividing the estate equally between them. From this judgment appellants appeal to this court again demanding a trial *de novo*.

The settled statement of the case for the purposes of this appeal contains certified copies or originals of all proceedings had in the county and district courts in the litigation involved in the issue here presented. We are confronted with a motion to strike made by each party, leveled at a portion of the matter embraced in the statement as settled; that of respondents Miesen going to the question contended for by them that the trial in the district court, while a trial *de novo*. should have been limited to a review of the transcripted and certified record of proceedings had in the trial in the county court; the sustaining of which motion would eliminate the cross-examination of the respondents and their various witnesses from the consideration of this court on this appeal; appellants contend that the appeal on trial *de novo* from the county to the district court permits a retrial of the action, the resubmission of testimony, with the district court acting as a trial, instead of an appellate, tribunal.

Respondents Miesen further predicate as error the action of the district court in permitting the filing after time of the undertaking on appeal from county court, and attack the jurisdiction of this court to consider the merits of the case; urging that this court should now do what they contend the district court on appeal should have done, summarily affirm the judgment for want of the proper appeal bond on the intermediate appeal.

We will therefore first consider whether the district court acquired jurisdiction. The statute, § 7966, provides: "To effect an appeal the appellant must cause a notice of the appeal to be served on each of the other parties, and file such notice with the proofs of service, and an undertaking for appeal in the county court within thirty days from and after the date of the order or decree." Section 7968 provides: "An executor, administrator, or guardian may appeal without filing an undertaking from a decree or order made in any proceeding in a case in which he has given an official bond; and when he appeals in that manner the bond stands in place of such undertaking. A special

guardian may appeal without filing an undertaking although he has not given bond." Two of the appellants appear by guardian.

Sec. 7969 provides: "When the appellant seasonably and in good faith serves a notice of appeal on some of the parties, but through mistake or excusable neglect fails to obtain service on all, or in like manner omits to do any other act necessary to perfect the appeal or effect a stay, the county court upon proof of the facts by affidavit may, in its discretion, extend the time for perfecting the service or other act, and permit an amendment accordingly upon such terms as justice requires." Other sections of the statute regulate stay proceedings and the amount and obligations of the undertaking on appeal, and attempt to define some procedure applicable to an appeal from any of the various and peculiar matters necessary of determination in probate proceedings. In this case the district court in remanding to the county court acted upon affidavit filed, making proof of seasonable and good faith action, and prima facie excusing the neglect or mistake in filing the fatally deficient undertaking on appeal, provided the statute, § 7969, can be held to apply in such a case and permit such practice. It is noticeable that these statutes on probate appeals in no instance make the service and filing of a valid bond a condition precedent to the attaching of jurisdiction on appeal. We here find no provision similar to § 8502 governing appeals from justice court, that "to render an appeal effectual for any cause an undertaking must be executed on the part of the appellant," with certain conditions required by a statute manifestly mandatory. It is also noticeable that appeals in other matters than from the county court are more easy of classification, making it a more simple matter to define the conditions to be necessarily required in such appeal bonds than in the bonds that may be necessary in the various appeals granted under art. 9 of our Probate Code. The issues in probate court are many and varying. Probate procedure deals with matters of estates in which justice more imperatively demands that technicality shall not stand in the way of the descent and distribution of the estates of deceased persons, nor interfere in many other kindred matters, all within the jurisdiction of the county court. The statutes on probate appeals are many and are to be construed broadly, that they may cover the full scope of such matters embraced. Sections 7964 to 7989 constitute an endeavor on the part of the legis-

lature to attempt to provide generally for such appeals to the end that some portion of the statute will apply to any appeal that may be taken. From the statute it is obvious that the jurisdictional requisite to an appeal is the service and filing of the notice of appeal as required, the undertaking on appeal being intended as security only, and not as a jurisdictional prerequisite. This may seem at first blush an unusual interpretation of undertakings on appeal. But such is the plain purpose of this statute. Section 7969, coming into existence as § 6259, Revised Codes of 1905, is purposely broader than the parent enactment found in § 5978 of Compiled Laws. The condition precedent to the permission of performance of other acts necessary to be done, including an amendment to the notice of appeal or filing or a new or amended undertaking, permitted under § 7969, is the seasonable and good faith service of a notice of appeal on some of the parties to the proceedings. The order under which permission was granted to file this new undertaking, based upon affidavit, finds this appeal to have been taken in good faith. If the statute be of any force, then it is to be applied to just such cases as the one before us, to prevent a defective bond from depriving a party of a trial anew on the merits where the appeal was in good faith attempted. We already have precedent for this holding. See Re Lemery, 15 N. D. 312, 107 N. W. 365, wherein an amended notice of appeal was permitted to be served and filed with a new undertaking with different parties petitioners, where certain petitioners for probate were omitted as parties to the original undertaking on appeal; and this, too, where the parties thus joined were conceded to be technically necessary parties to the appeal. The trial court properly permitted the service and filing of the amended appeal bond.

As the motion to strike involves the determination of whether the district court on trial *de novo* was limited to the transcripted record from the county court, prescribed in § 7979, construed with §§ 7984-5-6-9, decision of this question is next in order. These provisions are very similar to §§ 5975-6 of the Compiled Laws. The appeal taken is from all issues of law and fact with a retrial in the district court remanded. It is true specifications of error were served with the notice of appeal and undertaking on appeal, evidently under a misapprehension by appellants of their rights, but the notice of appeal invokes

the jurisdiction of the district court and demands a trial *de novo,* a right granted by statute, § 7971, which provides: "Every appeal must be held to have been taken upon the facts and matter in law generally, unless the notice clearly indicates an intention to appeal on questions of law alone." This is supplemented with § 7985, which provides: "When an appeal is taken generally, all the issues must be tried and determined anew in the district court, and the court must hear the allegations and proofs of the parties, and determine all questions of law and fact arising thereon according to the mode of trying similar issues originating in that court, except that an issue involved in the probate of a will and issues arising upon a petition for the allowance of a claim or demand for money only must be tried according to the mode of trying issues to a jury if a jury is demanded." These general provisions grant the right of trial *de novo* on such an appeal, and the clause at the end of § 7985, whereby where the record below was an issue submitted on affidavits or otherwise of record the issue on appeal must be determined from the certified transcript of such record, has no application to a trial *de novo* in the instant case. We cannot sustain respondents' contention that the right granted to a trial *de novo* is thus limited to a mere review in the district court of this record upon which the county court acted. Prior to statehood the right existed to a retrial on questions of both law and fact. See § 5976, Compiled Laws. Such has since continued. See § 6275, Revised Codes of 1895. And where a jury is demanded and had, the procedure is governed by that in vogue in equity cases as distinguished from jury trials. Section 5976 of Compiled Laws provides for trial *de novo* "as in suits in chancery" where no jury is had, and the same procedure is continued under later provisions cited. And this case is here as an appeal from an action triable in equity with this appeal governed by the provisions of § 7229, Code of 1905. We might state, however, that had a jury been demanded, and jury trial been had in district court, the record and appeal thereon would have been covered by the provisions governing appeals from issues triable to a jury. See Hedderich v. Hedderich, 18 N. D. 488, 123 N. W. 276; Auld v. Cathro, 20 N. D. 461, 32 L.R.A.(N.S.) 71, 128 N. W. 1025. As to appellants' contention that but a review in district court on the record made in county court is provided under §§ 7979 et seq. cited, we can-

not assent. The statute is not susceptible of any such construction when the scope of proceedings attempted to be covered by art. 9 of the Probate Code is considered. We must construe these sections in the light of the subject-matter thereby made appealable, and also the object sought to be covered by the trial *de novo* granted. To say that the trial *de novo* provisions are limited to such a trial on the transcript in practice abrogates the right of trial anew and nullifies the broad provision that "the court must hear the allegations and proofs of the parties according to the mode of trying similar issues originating in district court," as to do so on a certified record would be impossible of performance. Then, too, the right granted by the court to permit amendments to pleadings or permit new bonds to be filed or amendment to the issues to be so tried in district court, granted by § 7985, is hardly in harmony with the idea of a trial on a transcripted certified record as contended for by respondents. We conclude that the closing part of § 7985, reading: "But in other respects when the proofs on which the county court acted were submitted in the form of affidavits, or otherwise appear of record, the appeal must be determined upon the certified transcript," defines the procedure only where the proof was by affidavit or otherwise of record in the county court, and where a full determination thereof could necessarily be made by a review of such affidavits and certified transcripted record. Many instances in probate practice occur where such would answer fully all the objects for which the appeal was taken. For instance, where affidavits or testimony required to prove the uncontested probate of a will under § 8006, and under that section required to be made of record in the county court, could be so reviewed where only the legal question of the sufficiency of such proofs to admit to probate was in issue on such appeal, and where no trial *de novo* was demanded. Or likewise, a district court review of county court action may be had on the record of the presentation of a claim to an administrator or executor where the sufficiency of the proof of claim required under § 8100 alone is in issue, or in determining whether such a claim has been presented in time. Or again, in review of proceedings had on a real estate sale under county court decree when it may be accomplished by an appeal taken on law only and on the record fully determined under this provision as to appeals. Illustrations of its use might be

multiplied. It is to such matters where adequate relief may in such manner be had that the provision in question governs. It does not apply to a trial *de novo* where the issue of fact is, as in the instant case, the determination of the existence of a foreign common-law marriage. See Hedderich v. Hedderich, 18 N. D. 488, 123 N. W. 276, wherein an Indian marriage was asserted to defeat the probate of a will, a proceeding very similar to the issue before us, excepting that a jury trial below was demanded, instead of waived, a matter not in itself affecting the right to a trial *de novo,* which must exist in both instances alike if in either.

Respondents urge that under § 111 of the Constitution the district court had no jurisdiction to try this action *de novo,* except upon the record, and that to do so would be assuming original jurisdiction in violation of the constitutional mandate. Section 111 provides that county courts shall have "exclusive original jurisdiction" of this class of actions. Section 103 of the Constitution grants district courts general original jurisdiction except where otherwise provided in the Constitution, and "such appellate jurisdiction as may be conferred by law." Section 7985 provides of what such appellate jurisdiction shall consist, and that the district court may try the action *de novo* on appeal. It is by virtue of the right of appeal and the statute granting it, that such trial anew is had, and this is not the exercise by the district court of original jurisdiction. See Prante v. Lompe, 77 Neb. 377, 109 N. W. 496; Ribble v. Furmin, 69 Neb. 38, 94 N. W. 967, 968. Christianson v. Farmers' Warehouse Asso. 5 N. D. 438, at pages 446, 447, 32 L.R.A. 730, 67 N. W. 300; Cavanaugh v. Wright, 2 Nev. 166. In the absence of constitutional prohibition, the legislature has the right to regulate appeals and prescribe the mode of exercise of review by the appellate court. 2 Cyc. 507. This contention is without merit. The decision of these practice questions also determines adversely to the contention of the respondents Miesen their motion to strike from the statement all matters excepting those appearing on the certified record from the county court filed in district court on the intermediate appeal.

The next question is whether proof has been made of a common-law marriage under the laws of Michigan, at which place it is alleged deceased and respondent Dorothea Miesen, formerly Dorothea Harnau,

were married. On this alleged marriage depends the interest of respondents Dorothea Miesen and her son, Herman Miesen, they claiming to be the wife and son respectively of Anton Emil Peterson, this deceased. No ceremonial marriage is claimed. Proof is offered of a common-law marriage. It appears that in 1875 Dorothea Harnau, then seventeen years old, met deceased, then twenty-three years of age, in Muskegon, Michigan. She was working as a domestic at a boarding house where Peterson was boarding. Emil became attentive to Dorothea, resulting, as she claims, in their becoming married. Describing this occurrence, she uses the following language: "We had no marriage ceremony. We took a solemn oath unto each other to be as husband and wife and to be true to each other and ever after conduct ourselves as husband and wife, and he should recognize me as his wife, and I him as my husband." Throughout cross-examination she adheres scrupulously to the language of this comprehensive "oath." She is wholly unable, however, to fix the date, at first not knowing whether it was in 1876 or 1877; nor could she fix the month or any period that she would assert was within six months of the actual occurrence of this most important event. When confronted with the question of this being a red-letter day in her period of existence prior to that time, she then attempted to fix it as "the first part of '77; it must have been in either April or March." and again in response to the question, "Was it after January, 1877, or before?" replies: "I cannot remember exactly. We went together; I cannot give a definite answer." And to the question, "You cannot tell whether it was in 1876 or 1877?" answers, "I worked to Bails two summers, and I do not remember whether it was the first summer I worked there or the second summer."

This marriage was kept secret from her mother and likewise from his stepfather. The former objected to the young Norwegian, and the latter asserted the marriage of a Norwegian and a Dutch girl was not the proper kind of an alliance. So she kept on working as a domestic, Emil visiting her every week or every other week, ostensibly as her beau. She says they "cohabited together as husband and wife at every opportunity," and explains her understanding of cohabit as indulging in sexual intercourse. To her sister-in-law and a few relatives and acquaintances she asserts he introduced her as his wife, and at one place lived with her as such for a short time with the family at whose place

they were stopping. Proof is made of a few purported statements of Emil to the effect that "he had married Dorothea" or that she "was his wife;" but they never resided together as such or "kept house." Nor was she generally known as Mrs. Peterson, but instead her employers at the various places where she worked understood she was a single woman, though some of them knew Peterson was more or less attentive, and to them Dorothea had stated that "they expected to be married;" and this up to a few months before the denouement occasioned by the birth of the child Herman to Dorothea on Independence Day morning in 1878. Until after the birth of her child, Dorothea had never told her mother of her purported secret marriage to Emil. During the winter of her pregnancy Emil had, as Dorothea and the community generally believed, "gone to the woods" to work, but in reality, as appears from testimony offered by respondents, was employed on a railroad, carefully concealing his whereabouts from Dorothea, though she says she heard from him once or twice during the winter, the letters being addressed to her as Mrs. Peterson. But Emil returned in June, 1878, and for a time there worked in a mill, if the testimony of respondents' witnesses be true. During this period he made varying statements that he "was not married, but was going to get married," or that "he and Dorothea were married," and acknowledging that he was the party at fault for her pregnancy. She last saw him on July 3, 1878. On this date he was arrested on a charge of bastardy, but succeeded in playing a ruse on the officer, and, eluding recapture, became a fugitive from justice. The testimony of one party who made suggestions to Peterson as to the best way for him to get out of that country is offered by the respondents themselves. From this it appears that, after hiding for several weeks, he left for the West, and three months thereafter was heard from by this witness by letter from Peterson, then in Dakota, where he remained continuously until his death in 1905, excepting one trip back in 1879 to deed a 40-acre tract of land to his stepfather, evidently to prevent recovery for the support of the child in question.

Petitioner Davidson testifies to knowing deceased for twenty years. That he was told by him of his child back in Michigan; that he did not want his whereabouts known; that deceased got mail from Michigan by having it addressed to petitioner, to keep his actual whereabouts a secret, and that he got mail in that manner for four or five years.

That he never mentioned having been married, but stated that he had some trouble in Michigan that he did not want known.

The testimony discloses that the birth of Herman occasioned considerable surprise, at least among some of the witnesses who have testified, and that the people inclined to discuss such things, "all said she wasn't married." Dorothea admits that she felt "ashamed" and "did not go out in society much," and that "circumstances were such that I could not go out." The boy Herman remained unnamed until her marriage in 1870 to her present husband, when the source of her former trouble became known as Herman Miesen, and evidently lived in blissful ignorance of early circumstances and the identity of his own father, according to his mother's testimony, until about the time of or after his father's death. This singularly about coincides in point of time with the date of a letter by respondents' present counsel to a witness in the case, resident at Dalton, Michigan, stating that "Anton E. Peterson (Amel E. Peterson) recently died in this state, leaving considerable property, but he leaves no heirs that we know of. We find some letters written by you about twenty-five years ago to Peterson, which indicate that you knew him and his family," and inquiring for relatives. And very soon thereafter these respondents, Dorothea Miesen and Herman Miesen, are claimants for the $6,200, ready to be distributed to the heirs at law of the deceased.

The circumstance of the early marriage of Dorothea Harnau in her maiden name as a single woman to Miesen, the year following Emil's unceremonious departure, is explained by the testimony of Dorothea Miesen, that she had read in some newspaper that one Anton E. Peterson, whom she assumed was her common-law husband Emil Peterson, had died in Duluth, leaving her a widow. She is uncertain as to the date or year she saw this newspaper account, but knows it was before she married Miesen. In any event without divorce she remarried. The marriage record in evidence proves she married representing herself as a single woman, and under her maiden name of Dorothea Harnau, at Muskegon, Michigan, on October 29, 1879, by a ceremonial marriage. Her explanation as to why she used her maiden name is significant. Her testimony places her own interpretation on her asserted marriage, and her own uncertainty as to how she regarded her status at the time she married Miesen condemns her other testimony as to the existence of

any marriage with Peterson. She was asked, "Now why was it, Mrs. Miesen, you gave your name as Harnau when you married Miesen?" To which she replied: "I don't know why I did; of course we just took the oath and had no ceremony performed." When counsel asks, "You did not consider it a marriage?" she replies; "I considered it a marriage at the time." When counsel further inquires, "But later on you did not consider it as a marriage?" she made the following evasive reply, "I did not know whether other people considered it as a marriage." And counsel, pursuing the inquiry further, asked: "You say that you did not know what other people thought about it. Had you thought of what other people would say about it?" She answers, "No, I had not." To which counsel interrogates: "But you were of the opinion that other people might think that it was not a regular marriage?" To which she answers: "I do not know whether it was or not. I simply took my name Dorothea Harnau because he had gone and did not come back, and my mother said to keep my name."

When she married Miesen she was twenty-one years of age. She since has lived with him continuously over thirty years and has borne him five children. She now asserts in her endeavor to obtain this inheritance, her prior marriage to a man with whom admittedly she has never resided as a wife, and a man whose every act, though indefensible from every standpoint, has been contrary to the probability of any such marriage ever in fact having taken place. There are no equities in her claim. To establish it she must confess herself a bigamist as well as bastardize her own five children, and overturn a consistent course of living of thirty years' duration, for her paltry share, by inheritance, from a man whose decease demands that we refrain from characterizing his conduct in the matter.

Proof has been offered of the construction by the courts of Michigan of their statutes and the right of marriage as bearing upon the validity of this alleged common-law marriage in that state. A common-law marriage is there valid. But giving the widest possible scope to the proof with the benefit of every doubt to respondent Dorothea Miesen, and including all her own testimony, much of which is objectionable on the ground of incompetency, her claim of marriage cannot be sustained. It is true she recites what she terms as an oath probably sufficient in itself to constitute a contract of marriage *in præsenti,* and

she testifies it was followed by sexual intercourse the same evening between them; but that does not constitute sufficient proof of a marriage at common law in the face of the facts disclosed by this record. There was really no cohabiting as husband and wife, evidencing by repute the consummation of the marriage contract. On this the Michigan court in Lorimer v. Lorimer, 124 Mich. 631, 83 N. W. 609, says: "Our courts have gone a good way to sustain the validity of a marriage where an agreement to live and cohabit together as husband and wife has been made and acted upon. But at no time has it been said that, in the absence of a valid marriage ceremony, a simple agreement to live together, even though the parties intended to carry out the agreement, is sufficient to constitute a valid marriage, unless acted upon by living together and cohabiting as husband and wife." And again in the same case the court, quoting from an opinion of Justice Cooley in Hutchins v. Kimmell, 31 Mich. 126, 18 Am. Rep. 164, approved the following: "But had the supposed marriage taken place in this state, evidence that a ceremony was performed ostensibly in celebration of it, with the apparent consent and co-operation of the parties, would have been evidence of a marriage, even though it had fallen short of showing that the statutory regulations had been complied with, or had affirmatively shown that they were not. Whatever the form of ceremony, or even if all ceremony was dispensed with, if the parties agreed presently to take each other for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties, and which would subject them and others to legal penalties for a disregard of its obligations." It is apparent that, though sometimes ignored, it is necessary that an assumption of marriage relations be had to constitute a common-law marriage. 1 Bishop, Marr. Div. & Sep. § 380; Campbell v. Campbell, L. R. 1 H. L. S. E. App. Cas. 182, 211; Bishop v. Brittain Invest. Co. 229 Mo. 699, at page 728, 129 S. W. 668, at page 677, Ann. Cas. 1912, A, 868, from which we quote: "Cohabitation as husband and wife is a manifestation of the parties having consented to contract that relation *inter se*. It is a holding forth to the world by the manner of daily life, by conduct, demeanor, and habit that the man and woman who live together have agreed to

take each other in marriage and to stand in the mutual relation of husband and wife; and when credit is given by those among whom they live, by their relatives, neighbors, friends, and acquaintances to these representations and this continued conduct, then habit and repute arise and attend upon the cohabitation. The parties are holden and reputed to be husband and wife." To which Bishop adds: "The cohabitation must be matrimonial. The repute to have its fullest effect should be uniform. It then casts upon the party denying the marriage the burden of proving that it did not take place." The supreme court of Missouri, in Bishop v. Brittain Invest. Co. cited, in applying the law to an alleged common-law marriage with facts much stronger tending to establish the marriage than those before us, but in which the element of secrecy appeared on the question of the recognition of plaintiff as a wife, says of secret repute of the marriage relation, the following: "Such repute does not meet the stringent requirements of the law. . . . If the language, 'he recognized her as his wife,' refers to a general or full recognition from and after [the date of the alleged marriage], it is not sustained by the proof. . . . If it refers to a recognition now and then, sporadic, furtive, incidental, and not a continued public recognition 'a holding forth to the world by the manner of daily life, by conduct, demeanor, and habit,' etc., then it does not meet the high standard set in Campbell v. Campbell." And again from the same case: "As to the second clause [referring to presumption of marriage from cohabitation], it leaves out the element of general repute among the neighbors, friends, and acquaintances, arising from acts and continued conduct in holding themselves forth as husband and wife." See same in Cargile v. Wood, 63 Mo. 513: "Cohabitation and reputation are at best only presumptive proofs, and when one of these foundations is withdrawn what remains is too weak to build a presumption on. There is good sense in the Scotch law by which cohabitation alone is considered insufficient, and which requires in addition habit and repute, because it is said the parties may eat, live, sleep together as mistress and keeper without any intention of entering into marriage. Cohabitation is simply the first step, and when that is accompanied by an acknowledgment of the matrimonial relations and treating each other as a man and wife, and holding one another out to the world as such, there may reasonably be a presumption

founded upon all these facts that the intercourse is lawful, instead of meretricious." See also Topper v. Perry, 197 Mo. 531, 114 Am. St. Rep. 777, 95 S. W. 203, where facts stronger than these before us were held insufficient to constitute a common-law marriage, the court saying: "Certainly there was no such assumption of the marriage status after that night for over four months that would indicate that these parties regarded themselves as man and wife from and after that night. There was no such open and continued cohabitation and holding themselves out to the world as man and wife as usually characterizes the marriage relation."

What we have said assumes the truth of the testimony of Mrs. Miesen as well as its admissibility. As all witnesses tending to establish the alleged marriage testified by deposition, no advantage was given the trial court in determining the credence to be given the testimony over what can be gained from the transcript. We have weighed all evidence offered on behalf of respondents Miesen with great care, but are unable to concur in the findings of the lower court. Respondents have the burden of proving the marriage, and have not met that burden. After making allowances for the fact that they are testifying to matters occurring half a lifetime before, and that after such lapse of time uncertainty of recollection as well as difficulty in obtaining proof is but to be expected, yet we cannot conclude otherwise than that the proof shows no marriage, rather than the existence of one. The presumption naturally arising from certain established cardinal facts negatives absolutely the existence of a marriage. Both parties have irrevocably so construed their relation by their own actions, and in this indeed do actions speak louder than words. Time does not efface the fact nor obliterate the reason nor alter natural presumptions to be drawn from the secrecy in which the relations of these parties were shrouded. His flight from the country and subsequent life under a cloud strongly indicates an intent to avoid the consequences of meretricious relations with this girl, and evinces his continued determination to remain a fugitive from justice, as he early chose to do, rather than to marry her. His breaking from arrest and subsequent flight would be admissible in the prosecution against him for bastardy, to avoid the results of which he fled. It would be strange reasoning indeed to say that, such being the case, it did not refute the idea of a previous marriage as well

as evidence well nigh conclusively his intent not to marry. It certainly could not be considered as the natural act of a married man accused of unlawfully begetting his own child, when all he had to do to disprove guilt was to establish his past marriage or then assume the marriage relation. Then, too, the subsequent life of Dorothea Miesen has been equally inconsistent with her present claim. As much so was her conduct during pregnancy as we have it described from her own lips. It would seem that naturally her first impulse would have been, had such marriage existed, to claim its benefits and absolve herself from shame and ignominy necessarily attendant upon her under those conditions. Strange indeed her actions in not informing her own mother of her secret marriage before surprising her with the birth of an apparent bastard child. Such secrecy is not what would be expected under those circumstances from a woman nineteen or twenty years of age, when all that was necessary to relieve herself from blame, restore her to respectability in the community, and give her own child a name, was to assert the existence of the previous fact of marriage, conceding it so to be, instead of by needless secrecy living a lie and enduring needless disgrace. The fact from her own lips that for thirty years she never informed Herman that Peterson was his father is damning to her testimony, and it stands as strong proof of his illegitimacy. And when after such a period of time, apparently about contemporaneous with the death of her unmarried friend of thirty years before, the plundering of his estate furnishes a notice for the assertion of such a claim, we must view it with askance, the motive for the claim so clearly appearing. Her claim of marriage is conclusively disproven. For a Michigan parallel holding that the acts of parties are controlling, see Cross v. Cross, 55 Mich. 280, 21 N. W. 309–313; see also Sharon v. Sharon, 79 Cal. 633–669, 22 Pac. 26–36, 131. The fact that no claimants other than aliens resident in a foreign country can inherit if the Miesens do not, cannot alter the situation, as the laws governing inheritance are not modified by public policy.

On the merits respondents Dorothea Miesen and Herman Miesen are without interest in these proceedings. Dorothea Harnau was never married to Anton Emil Peterson, deceased, and Herman Miesen, though he be their illegitimate son, cannot inherit from Peterson, his father; there being no pleadings nor proof upon which can be made a

22 N. D.—32.

claim of adoption by the father of such illegitimate son, under § 4118, Rev. Codes 905, construed in Eddie v. Eddie, 8 N. D. 376, 73 Am. St. Rep. 765, 79 N. W. 856.

Because in passing upon the merits of this case it was unnecessary to determine the competency of the testimony of the alleged wife, wherein she testified to the alleged marriage, her testimony having for the purpose of this suit been considered without excluding any part thereof, we do not mean to determine that such testimony is admissible under our statute, § 7253. It is unnecessary to determine the question of its admissibility, and therefore we do not pass upon that question raised.

We now turn to the evidence touching the relationship of the appellants to Anton Emil Peterson, the deceased, all of which was offered under objection on the part of respondents Miesen. The elimination of these two respondents from this action does not obviate the necessity that full proof of relationship and right in law to inherit exist as the basis for an order of final distribution. Besides, the state is interested, as, in the event of a failure of heirs, the estate of the deceased, under the statute, must escheat to the state.

Proof is offered along two lines: First, evidence tending to establish heirship under the rules applying to admissibility of matters of family history, including entries in a family Bible; and second, documentary proof offered consisting of copies of various church records from Norway, certified as such by the keepers thereof whose official capacities are variously authenticated; which nonjudicial records are offered to establish the pedigree and family tree of the deceased; as supplemental proof of heirship to that contained in the family Bible tending to identify respondents as the heirs now entitled to receive their distributive shares of this estate. On the declarations as to family history we have testimony of one Nord, taken on deposition. From this it is established that one Hans Peterson Mortkjarnet was the stepfather of the deceased and resident for years near Muskegon, Michigan. He died in 1888. He was there when deceased fled that country. He died possessed of a Bible containing entries as to births, deaths, marriages, and family *data*. He had stated to the witness that this Bible once belonged to Anton Emil Peterson, deceased, having been given him by his stepfather Hans, remaining, however, in the possession of

the old man, from whose house at his death the Bible was taken by the witness, who has since retained its custody. This Norwegian Bible was obtained from the old country, and contains a page of records of births, deaths, and marriages, showing the marriage of the step-father to the mother of deceased, Peterson, and the death of the mother in 1864. Other relatives are also named. Therein is contained the statement: "This belongs to me, Hans Peterson Mortkjarnet," and the later indorsement, "Now this book belongs to Anton Emil Anderson Mortkjarnet," meaning Peterson, deceased. The witness testifies to certain of these entries being in the handwriting of the deceased Peterson. When counsel for the Miesens was endeavoring to ascertain the heirs of the deceased, they wrote the witness, Nord, who still had the family Bible in his possession, and he tore out the leaf containing the above entries and sent it to them. Counsels' letters are in evidence, acknowledging its receipt. Thereafter on request of witness Hobe, resident in St. Paul, and Norwegian consul for this territory, the Bible leaf in question was mailed him, together with a letter written by counsel for the Miesens, explaining part of such entries. Hobe admits its receipt, but testifies to its having been returned to the counsel from whom he obtained it, but who deny its return. It is plain that both Hobe and counsel are in good faith in this matter, and that this leaf from the family Bible has been lost or unintentionally mislaid. However, a sworn translation of it was preserved by Hobe, and is offered in evidence in lieu of the original. The letters in question are in evidence. We deem the foundation for the receipt of the exhibit sufficient, and the objection to the competency of this exhibit itself and the Bible also offered not to be well taken. The proof establishes the Bible to have been the family Bible of deceased Peterson and his step-father, and that the entries therein made accordingly are in the nature of declarations of the deceased and family as to matters of their family history, and as such are admissible as matters of family history deriving testimonial qualification, thus entitling them to admission from the fact of their having been made by members now deceased of the family in question concerning matters of family history as to which the family is presumed to have accurate knowledge, and all made at a time long prior to the arising of this controversy and when there could exist no motive to deceive. Under all the authorities the family Bible

and these statements therein contained were admissible.  See Wigmore,
Ev. §§ 1482–1496; 16 Cyc. 1122–1132, 1223–1241; 20 Century Dig.
cols. 1602–1617; 2 Decen. Dig. pp. 958 et seq.

This takes us to the second inquiry as to whether the church records
can be received over objections as to want of foundation laid and in-
competency.  They are intended to supplement the Bible entries as
proof of identity of the appellants as the heirs of deceased Peterson.
These church records consist of seven different purported transcripts
of that number of church records of births, deaths, marriages, and mat-
ters of family history tending to connect the various appellants in
blood relationship to the deceased Peterson.  Each transcript is under
oath certified by a person describing himself as the parson of such
particular church and the keeper of such church records, and that the
transcript made by him is a true and correct copy of the original rec-
ords of such church parish, kept by him or his predecessors under duty
imposed by law; and affixed to each certificate, and authenticating
both the certificate and the official signature of such parson in each
instance, is the certificate of the district judge under the seal of the
court of the district in which such church is situated, certifying to
the official character of such judge and of such parson, and that such
parson is the authorized and legally required keeper of the church
records of the church in question.

Further, that such church records are those established by the laws
of Norway, and are receivable in evidence as proof in any court in
Norway, and that the originals cannot be removed from the district.
Accompanying such certified copies in Norwegian are translations
thereof in English, duly certified by "the official translator to certified
translations," together with a statement of his official character and to
the correctness of the translation and the genuineness of the signature
of the attesting judges.  There is also attached to each of the seven
certified copies the certificate under seal of the chief of the ecclesias-
tical ministry of Norway, stating the law and certifying to the sig-
natures of the pastors.  Accompanying these certified records is the
certificate of the consul general of the United States, resident in Chris-
tiania, Norway, certifying under his official seal the genuineness of
the signatures of the attesting district judges and other officials, and
that the several certificates were executed by lawful authority and.

entitled to full faith and credit as such. Proof is offered on the trial, explanatory of these church records identifying the deceased with the line of descent thus attempted to be proven. If such proof is admissible it establishes the respondents' claim to this inheritance.

Our statutes do not prescribe the foundation necessary to admit such proof. Hence resort to the common law. Such may consist of proof of facts by deposition sufficient to constitute a foundation for the evidences offered, or by the more convenient mode where permissible of the use of certificates to authenticate documents, which authentication operates as a testimonial guaranty sufficient for their admission. In any event before these copies of foreign nonjudicial official records are admissible, it must appear that the originals are there official records of such foreign country. To establish this fact, proof of the foreign law making them official records and imposing the duty of their keeping must be made in the same manner as the proof of any other fact in issue. See extensive note to State v. Behrman, 25 L.R.A. 449. In the absence of statute regulating the class of proof required to establish the foreign law, the written law can be proven only by the foreign written statutes or properly exemplified copies thereof. But as to the unwritten law of the foreign country, proof is made by the testimony of those familiar therewith competent to testify, and after sufficient foundation is laid to satisfy the court that the witness testifying is qualified to testify on the subject. Our statute, § 7291, makes the same distinction in kind of proof required. Admitting the qualification of Hobe, consul for Norway, to testify as an expert, the fact does not appear that the laws of Norway under which the purported documents are required to be kept are in writing, or whether they exist as unwritten law, either common or civil. Of the fact we cannot take judicial notice. Hence the proof necessary to admit these documents is wanting so far as oral testimony offered as a foundation is concerned.

But are the documents themselves sufficient to establish their admissibility? We will take judicial notice of the official signature, seal of office, and genuineness of the certificate of the United States consul accompanying these records. Granting full force to such certificate, it but establishes the signatures of the district judges as genuine and that full faith and credit may be given to their statements. They in turn certify the parsons as the keepers of these records, and

that the same are official and such as are obliged by the laws of Norway to be kept. Can we accept as evidence their certified declarations as to the law? We think not. What Hobe could not testify to because of it being a matter required by statute and common law to be proven by written statute if in existence in Norway, we cannot accept as established in such manner equally indefinite in the same particulars. Then, too, this class of official records is not provable by certified copies alone without other foundation for their admission under our statute, §§ 7300–1. If these statements were certified by the King or his immediate subordinate, attested by the great seal of state, by force thereof they would be admissible. Rev. Codes, § 7300, subd. 4. And such is the common law. Wigmore, Evidence, § 1679, p. 2112; 1 Greenl. Ev. §§ 486–489. But under § 7300 it is only the acts of the foreign executive or foreign legislature that can under these sections be received. But proof of the kind offered is barred. Notice that § 7300 in the last three subdivisions thereof provides for the reception of certified copies of this class of documents when coming from sister states or Federal departments of government, and there stops short. And by common law similar documents from foreign countries are not admissible without proof of the official character of the originals and of the law requiring their keeping as official records. Under § 1633 of Wigmore on Evidence, quoted with approval in Miller v. Northern P. Ry. Co. 18 N. D. 19, 118 N. W. 344, 19 Ann. Cas. 1215, although passing on a different statute and as to evidence offered from a sister state, this testimony by certified copies would be admissible though made by a foreign officer, when once there is established the foundation for its admission by full proof of the official character of the original if accompanied by the certificate proof here presented. See also note in 25 L.R.A. 449, and Wilcox v. Bergman, 96 Minn. 219, 104 N. W. 955, same case with valuable note in 5 L.R.A.(N.S.) 938.

We might remark that the rules stated as to the foundation necessary to admit certified copies of these foreign nonjudicial, but official records, has no application to any similar proof offered when coming from any state or territory a part of the United States, being fully covered by our own statutes, §§ 7291 to 7301, inclusive; all of which statutory regulations must be construed as subordinate to and to be harmonized with art. 4, § 1, of the Constitution of the United States, pro-

viding that "full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state, and the Congress may by general laws prescribe the manner in which such acts, records, and proceedings shall be proved and the effect thereof;" pursuant to which Congress has enacted U. S. Rev. Stat. §§ 905, 906, U. S. Comp. Stat. 1901, p. 677, providing thereby a uniform method of proof and authentication to which state legislatures cannot add more onerous burdens as to proof arising from other states, but which burdens they may by statute lessen. In addition to both rules we have the common-law rule, more inconvenient, and with higher requirements than those required by the Federal or state rules. In the instant case the requirements under common-law proof have not been met, and the instruments offered are inadmissible on the foundation laid.

From the declarations of matters of family history proven by Bible entries, there is insufficient evidence upon which a decree of final distribution herein can be granted. But it appears that proof may on retrial be made of the right of some of appellants to share in this estate. Accordingly we order that the judgment of the district court be reversed and vacated and the petition of respondents Miesen be dismissed for want of merit, and we remand this action to the district court of Benson county for further proceedings as to the claims of the appellants, directing that the action be there retained for trial on the right of these appellants to inherit this estate, and in the event of a determination adverse to them judgment will be entered that the estate of Peterson, deceased, escheat to the state of North Dakota. The district court is directed to grant appellants such reasonable time, and in any event not less than four months if desired, within which to submit proof of heirship. And the appellants will take all further proceedings herein only on notice thereof to the state's attorney of Benson county and the attorney general of the state of North Dakota, either of whom may appear and participate in behalf of the state. The final judgment of the district court will direct the judgment to be entered in county court.

Appellants will recover costs and disbursements taxable in the coun-

ty, district, and supreme courts, against Dorothea Miesen and Herman Miesen.

BURKE and BRUCE, JJ., being disqualified, Honorable W. H. WINCHESTER, Judge of the Sixth Judicial District, sat by request.

On Petition for Rehearing.

GOSS, J. In a petition for rehearing counsel have questioned in many particulars the opinion filed. We adhere to our decision. Counsel vigorously attack the constitutionality of the trial *de novo* provisions of § 7985, authorizing a retrial in district court on the matters involved in the distribution of the proceeds of the estate, concerning which the existence of a common-law marriage constituted the main issue. While the matter is but incidental to the exercise of probate jurisdiction, yet as § 7985 confers on appeal on the district court the duty of trying *de novo* probate matters mentioned in such section, its constitutionality is challenged, and if such statutory right of appeal is invalid the judgment of the county court would be conclusive and should be affirmed, as jurisdiction to try *de novo* would not be conferred by the appeal upon the district court, because of the unconstitutionality of the appeal statute. If the statute is unconstitutional the district court trial as had was a nullity. The constitutional provisions are recited in the main opinion. Do the provisions of § 111 of the Constitution, granting to the county court "exclusive original jurisdiction in probate and testamentary matters (enumerated), and such other probate jurisdiction as may be conferred by law," prohibit retrial in district court on new evidence,—a trial *de novo* in all particulars? We answer emphatically that it does not. A trial *de novo* is but the exercise of the appellate jurisdiction conferred by law and authorized under § 103 of the constitution, defined in practice by § 7985. The legislature has thereby seen fit to declare the manner of exercise of the appellate jurisdiction with which the district court on appeal is clothed to be that of trying the cause anew, instead of limiting the appeal to a review of a record already made. Such appellate court at the conclusion of such trial enters its judgment under § 7986, directing the form and substance of the judgment to be entered in the county court, the court of ex-

clusive original jurisdiction, and in so doing but exercises its appellate jurisdiction in the manner prescribed by law.

Counsel cite as against the constitutionality of the statute mentioned a decision of this court on the Newman law, Christianson v. Farmers' Warehouse Asso. 5 N. D. 438, 32 L.R.A. 730, 67 N. W. 300. This case cannot be construed as authority for counsel's position. It fully supports our holding. We quote therefrom the following; found on pages 446, 447, of the opinion: "We find no definition of appellate jurisdiction so limited that it will not permit the appellate court to review the facts as well as the law if the legislature so required. As we have seen the supreme court of the territory of Dakota at the time of and prior to the adoption of our constitution was expressly required to review facts in certain cases under § 5237 of Compiled Laws. We have no authority for saying that the constitutional convention intended to curtail that jurisdiction. Nor have we any warrant for saying that such convention used the words 'appellate jurisdiction' in § 86 of the Constitution in any other or different sense from that given to the same words in § 103, defining the jurisdiction of the district courts. And when in the latter section it is declared that the district courts shall have 'such appellate jurisdiction as may be conferred by law,' it is not meant that the legislature may define appellate jurisdiction and make it mean one thing in one case and a different thing in another case. It is only meant that it shall have appellate jurisdiction in such cases as the law may declare. It is undisputed that the appellate jurisdiction in such courts may be exercised by a strict trial *de novo* upon new pleadings and entirely new evidence, but it is entirely competent— and it is almost universally done—for the legislature to declare that in certain cases involving only small amounts the appellate jurisdiction of those courts shall be exercised only in the correction of errors, and such provisions do not affect the question of appellate jurisdiction, but of appellate procedure. In Story on the Constitution § 1761, that learned authority in discussing the appellate jurisdiction of the Federal Supreme Court, says: 'In the first place it may not be without use to ascertain what is here meant by appellate jurisdiction and what is the mode in which it may be exercised. The essential criterion of appellate jurisdiction is that it revises and corrects the proceedings in a cause already instituted, and does not create that cause. In reference to

judicial tribunals and appellate jurisdiction therefore necessarily implies that the subject-matter has been already instituted in and acted upon by some other court whose judgment or proceedings are to be revised. This appellate jurisdiction may be exercised in a variety of forms, and indeed, in any form which the legislature may choose to prescribe; but still the substance must exist before the form can be applied to it.' We know of no clearer statement of the points under discussion than is contained in Judge Story's language. Appellate jurisdiction cannot create a cause; it must be first created and adjudicated by another judicial tribunal. Those facts existing, the appellate court may exercise its jurisdiction in any form the legislature may prescribe. The legislature may require the appellate court to review the facts and render final judgment. If in so doing it exercise some of the functions of a court of original jurisdiction, we answer that there is neither constitutional nor legal reason why it should not."

The celebrated and pioneer case on the Federal Constitution is that of Marbury v. Madison, 1 Cranch, 137, 2 L. ed. 160. It was there sought to compel the issuance of an office commission by mandamus commenced as an original proceeding in the Supreme Court, based upon the authority of a statute assuming to so grant to the Supreme Court original jurisdiction. The Federal Constitution, while not in express terms denying the Supreme Court original jurisdiction in such matters, did expressly declare the original and appellate jurisdiction of that tribunal; and by inference denying it original jurisdiction excepting when granted by the Federal Constitution in express terms. This implied negative against original jurisdiction was given force and held controlling and as rendering the statute granting such excess of original jurisdiction unconstitutional. The following language of Chief Justice Marshall is instructive: "When an instrument organizing fundamentally a judicial system divides it into one supreme, and so many inferior courts as the legislature may ordain and establish; then enumerates its powers and proceeds so far to distribute them as to define the jurisdiction of the supreme court by declaring the cases in which it shall take original jurisdiction, and that in others it shall take appellate jurisdiction, the plain import of the words seems to be, that in one class of cases its jurisdiction is original, and not appellate; in the other it is appellate, and not original. . . . To enable this

court, then, to issue a mandamus, it must be shown to be an exercise of appellate jurisdiction, *or to be necessary to enable them to exercise appellate jurisdiction.* It has been stated at the bar that the appellate jurisdiction may be exercised in a variety of forms, and that if it be the will of the legislature that a mandamus should be used for that purpose, that will must be obeyed. *This is true, yet the jurisdiction must be appellate, not original.* It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause *already instituted, and does not create that cause.* Although, therefore, a mandamus may be directed to courts, yet to issue such a writ to an officer for the delivery of a paper is in effect the same as to sustain an original action for that paper, and, therefore, seems not to belong to appellate, but to original jurisdiction. *Neither is it necessary* in such a case as this, *to enable the court to exercise its appellate jurisdiction.*"

From the foregoing portions which we have italicized it is plain that the legislative right to prescribe the manner of exercise of the appellate jurisdiction is there recognized; and the distinction drawn not on the manner of its exercise, the appellate procedure used, but rather in denial of the right of an appellate court to be used as a court wherein causes of action may be originally litigated. This case is consonant with the opinion of our court in Christianson v. Farmers' Warehouse Asso.; and also Cavanaugh v. Wright, 2 Nev. 166, a case on all fours with the one at bar. We quote therefrom: " 'appellate jurisdiction' in its most limited and technical sense means jurisdiction to retry and determine something that has already been tried in some other tribunal. If we were to give the phrase its most technical and limited meaning, we might rather hold that the framers of the Constitution intended thereby to require that all appeals from justices should be tried *de novo,* than that none should be so tried. But we are not disposed to give it so narrow and technical a construction. We think as used in the Constitution the phrase 'appellate jurisdiction' was intended to be used in a broad and comprehensive sense. It was intended to confer jurisdiction upon the district courts to hear cases on appeal either in the strictest sense, which would require a trial *de novo,* or to review them as law cases are reviewed at common law. We think the language quoted from the eighth section clearly confers on the legislature the power to regulate the manner of appeals to the district court. It might require in one class of

cases that upon appeal the trial should be *de novo* and in other cases a simple review of the proceedings of the court below. The legislature has required the trial in the district court to be *de novo* in all cases, and we think it had the right to do so. The law is not in conflict with any constitutional provision. We see nothing in the fourth section of article 6 of the Constitution which confers appellate jurisdiction on this court [district court], which militates against the views we have herein expressed." The case of State ex rel. Pleasure v. McClellan, 25 Fla. 88, 5 So. 600, may be considered as contrary to our conclusion unless the exception mentioned in the last paragraph thereof be borne in mind. That court, after holding that the purpose and effect of a trial *de novo* on appeal was the invoking and use of original as distinguished from appellate jurisdiction, shows the opinion to have been written more with reference to appellate procedure than to jurisdiction. We quote from the concluding paragraph: "The jurisdiction to try a proceeding relating to the forcible entry or unlawful detainer of lands is a law jurisdiction; and at law, barring the legislation as to trials *de novo*, such a thing as the introduction of new evidence has not been permitted on either a writ of error, or on our law appeal. The same is true of appeals in equity. State courts have no admiralty jurisdiction, and the peculiar practice in that branch of jurisprudence cannot be invoked as in point." It is also evident that this holding is influenced by the peculiar phraseology of the Florida Constitution in defining jurisdiction, original and appellate, of its various courts. See State ex rel. Wallace v. Baker, 19 Fla. 19, decided prior to State ex rel. Pleasure v. McClellan, in which the court uses the following language: "In many of the states where the jurisdiction of the courts is not so sharply defined, it is provided that a new trial may be had in the circuit court on appeal from judgments of inferior courts. It was so in this state under the former Constitution, which gave circuit courts original jurisdiction of matters without regard to the amount involved; and, having such original jurisdiction, it could try *de novo* causes brought before it by means of the statutory appeals from justice's courts, in the same manner as causes commenced by summons. But as the present Constitution forbids the circuit courts to take original jurisdiction of matters at law involving less than $100 in value or amount, the legislature cannot confer such jurisdiction by indirect means." The same may be said of State ex rel.

Chestnut v. King, 20 Fla. 399. That trial *de novo* may be considered essential to an exercise of appellate jurisdiction, see Dodds v. Duncan, 12 Lea, 731. Idaho, under constitutional provisions interpreted by its supreme court as classifying jurisdiction in the probate and district courts identically as is done under the constitutional provisions of our state under consideration, has fully adjudicated the very question before us, as will be found in Re McVay, 14 Idaho, 56, 93 Pac. 28; Christensen's Estate, 15 Idaho, 692, 99 Pac. 829; Re Sharp, 15 Idaho, 120, 18 L.R.A.(N.S.) 886–898, 96 Pac. 563; Idaho Trust Co. v. Miller, 16 Idaho, 308, 102 Pac. 360; and McGregor v. Jensen, 18 Idaho, 320, 109 Pac. 729. The first two cases are on all fours with the case at bar, and contain lengthy discussions of appellate and original jurisdiction, the opinion in the McVay Case being written after rehearing had on this identical question. We quote therefrom: "An examination of §§ 20 and 21 of art. 5 of the Constitution discloses at once the fact that the framers of that instrument saw fit to classify 'matters of probate, settlement of estates of deceased persons, and appointment of guardians', as separate, distinct; and aside from 'cases at law and in equity' over which they gave the district court 'original jurisdiction.' It will also be seen from § 20 that 'in all cases, both at law and in equity,' from which they have clearly distinguished 'matters of probate, settlement of estates of deceased persons, and appointment of guardians,' the district court has 'original jurisdiction,' and that in all other matters which the legislature might provide for being heard in district courts the jurisdiction should be solely 'appellate.' The words 'original jurisdiction' and 'appellate jurisdiction,' as employed in § 20, are used in the clearest and most unequivocal contradistinction to each other. By § 21 the probate courts are given the sole and exclusive 'original jurisdiction' in all matters of probate. . . . Under § 20, art. 5, of the Constitution, the legislature is the sole and exclusive judge as to the extent and scope of the 'appellate jurisdiction' that they will confer upon district courts. . . . It must be assumed that the legislature, when it passed the act . . . providing for a trial *de novo* in the district court on appeal from the probate court in probate matters, was acting within the purview of the Constitution, and did not intend to go any further than to provide for the exercise of the 'appellate jurisdiction' of the district court." This act granting such appeal reads: "The

appeal may be taken either upon questions of [law] or both law and fact. If taken upon questions of law alone the district court may review any such questions which sufficiently appear upon the face of the record or proceeding without the aid of a bill of exception, but no bill of exception shall be allowed or granted in probate court in probate matters. If the appeal be upon questions of both law and fact the trial in the district court shall be *de novo.*"  Commenting thereon that court says: "If, however, the cause is not reversed on questions of law, then the same questions of fact as were tried in the probate court will be retried in the district court as other trials in said court are conducted. Witnesses may be called and may testify the same as in the trial of any other cause.  In other words, this statute under the Constitution grants to the district court appellate jurisdiction to retry only the same issues of law and fact as were heard and determined by the probate court.  Whatever judgment may be entered in the district court is to be certified back to the probate court for execution in accordance therewith."  The appeal statute quoted grants more limited appellate powers than ours, but is given full force according to its terms, including the trial *de novo* feature thereof.  But it may be contended that this construction would grant a right of appeal and trial *de novo* in district court after issue joined in probate court, where either no testimony was taken in probate court or merely a perfunctory trial had, and would result in the probate court being used similarly as a justice court is often used where the parties intend to try the issue finally in the district court; and that would be in effect permitting the exercise by the district court of original jurisdiction in probate matters.  This was precisely the argument advanced in the case of Christensen's Estate, 15 Idaho, 692, 99 Pac. 829, the syllabus of which reads: "Upon the hearing in the district court the case must be retried upon the same issues presented to the probate court, and witnesses may be called and testify the same as in the trial of any other cause.  The fact that either party failed to present evidence in support of the issues made in the probate court is not a ground or reason for dismissing the appeal to the district court, and the proof offered or a showing that no proof was offered in the probate court cannot be presented to the district court by affidavit in support of a motion to dismiss the appeal, as the cause in the district court is to be tried *de novo* upon the issues made in the pro-

bate court. . . . When an appeal to the district court in a probate matter is completed the case is transferred to the district court to be tried *de novo,* and the fact as to the offering of proof or the failure to offer proof in the probate court is of no consequence whatever." And quoting further from the opinion: "A party to a probate matter upon appeal to the district court cannot present the proof taken in the probate court or show the absence of proof by affidavit, as the district court is required under the statute to proceed to a trial *de novo;* and whether either party made or failed to make a case in the probate court does not concern or govern the district court in considering the issues presented to it for trial. . . . The statute does not limit the right to appeal in a probate matter to cases where the appellant offered proof in support of the issue before the probate court."

Bearing in mind the construction of the supreme court of Idaho on their constitutional provisions, to be that the probate court there possesses sole, exclusive original jurisdiction, as granted ours under § 111 of our Constitution, the case from that court of Re Sharp, 18 L.R.A. (N.S.) 886, is in point. We quote from page 897: "The matter of appeals from probate courts is within the legislative will, and the law-making power may regulate it, extend it, or limit it, as it sees fit."

The case of St. Louis County v. Sparks, 11 Mo. 202, is apparently an authority supporting respondent's contention, but in reality is a decision denying a trial *de novo* in the absence of a statute prescribing the right thereto in appeals from county court, as is explained in Lacy v. Williams, 27 Mo. 281, where it is said "a trial *de novo* in the circuit court would not strictly be the exercise of appellate jurisdiction (St. Louis County v. Sparks). It is clearly competent for the general assembly to confer such a jurisdiction, but, until it is expressly done, we do not consider that the bestowal of mere appellate power would authorize the courts to try causes *de novo.*" Many similar holdings may be found. See 3 Century Dig. cols. 1369–1379. And many cases favor a trial *de novo* when granted by statute, but are decisions where the statute is not challenged on the ground of alleged unconstitutionality. As illustrative cases, see Hedderich v. Hedderich, 18 N. D. 488, 123 N. W. 276; Levy v. Moody, — Tex. Civ. App. —, 87 S. W. 205; Fitts v. Probate Ct. 26 R. I. 256, 58 Atl. 801; Decker v. Cahill, 10 Okla. 251, 61 Pac. 1101; Norway Plains Sav. Bank v. Young, 68 N. H. 13,

36 Atl. 550; Mills v. Bradley, 1 Blackf. 541; Harris v. Foster, 5 Ark. 717. Many states, like California, by Constitution confer upon the legislature power to regulate and define probate and kindred jurisdiction, and therefore their decisions are inapplicable. The case of Prante v. Lompe, 77 Neb. 377, 109 N. W. 496, cited in the main opinion, it is true, is under a Constitution where in concurrent jurisdiction of matters of guardianship is conferred upon the county and district courts; but the decision there made is not based thereon, but instead, is a holding that a trial *de novo* is not an exercise of original jurisdiction.

But respondent may argue that this interpretation of our constitutional provisions permits the legislature, by a process styled by it as an appeal, to abrogate the constitutional provision that probate courts shall have exclusive original jurisdiction in probate matters, and in effect confers original jurisdiction upon the district court; and, further, that if this conclusion is sound, the same consequences will result with reference to trial matters generally, either probate as to the probate court, or as to law and equity in the district court, whereby the supreme court may in a similar manner, by legislative caprice, be made in practical effect a trial court concerning appeals from either district or probate courts. And we may be asked why, under our holding in this case, such may not inevitably follow, and if so, what constitutional barrier remains to define the jurisdiction of the several courts or keep separate their jurisdictions from confusion or intermingling at the will of the legislature. This is effectually answered by the determination of the meaning of the terms "original jurisdiction" and "appellate jurisdiction," as in force at the time of the adoption of the Constitution; when considered with the phraseology of §§ 86, 103, 111, defining the jurisdiction of the supreme, district, and county courts respectively. With this it must be remembered that as to the probate court, § 111 of the Constitution is a grant of power; while as to the supreme and district courts the constitutional provisions are not wholly a definition of jurisdiction, but rather a limitation of powers already possessed. The district courts were courts of general jurisdiction in law and equity, the general common-law trial court; while the supreme court succeeds to the powers of the court of King's bench through which appellate jurisdiction was exercised by the use of writs of error as to errors of law and writs of certiorari as to jurisdictional matters arising on the records

of the lower courts, with additional original jurisdiction to exercise a general superintending power over the inferior courts and a similar original jurisdiction to be exercised by prerogative writs, the latter in enforcement of sovereign rights. Hence § 86, reading: The supreme court shall have appellate jurisdiction only, and shall have a general superintending control over all inferior courts, read in connection with § 87 thereof, but declares the general conception under the common law of the powers so vested and inherent in that court, and constituting it the supreme appellate tribunal of the state.

But as to the district court its jurisdiction was equally well understood and defined at statehood at a time when it was exercising, under the right of appeal to it from inferior courts, the power to try *de novo* matters of fact as well as law; when the term "appeal" so used meant more than the common-law process under writ of error; and when an appeal taken on both law and fact must have meant what it now means, the trial *de novo* in that court, wherein evidence was offered and the trial had without reference to the manner or the record of the trial in the court below. See Constitutional Debates, 293–317, & 570–571, concerning these constitutional provisions. With such a practice then prevailing, can we conclude that these constitutional provisions were drafted and adopted with reference thereto and with reference instead to the ancient notions prevailing in the early history of this country, under which an appeal, if existing, meant but a review of a record, instead of a trial *de novo?* In the words of Justice Bartholomew in 5 N. D. 446: "We have no warrant for saying that the constitutional convention intended to curtail that jurisdiction," as then existing in such courts. And we have no better light in which to determine the intent of the Constitution and its framers than such contemporaneous history; remembering also that, as is said in Martin v. Hunter, 1 Wheat. 304, 4 L. ed. 97, the Constitution unavoidably deals in general language." And again, in M'Culloch v. Maryland, 4 Wheat. 407, 4 L. ed. 601: "A Constitution to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind." See also Ex parte Henderson, 6 Fla. 279.

And in reality the terms "appellate jurisdiction" and "original juris-

diction" are relative terms, and, like the basic term "jurisdiction," dependent upon the manner of use, the context, and the understanding had of the term in the light of its application. Jurisdiction to a state is in Sanders v. St. Louis & N. O. Anchor Line, 97 Mo. 26, 3 L.R.A. 390, 10 S. W. 595, held coextensive with its sovereignty, and conveys a different meaning than its use applied to courts. In one court, as in Cavanaugh v. Wright, 2 Nev. 166, is held when strictly construed to mean jurisdiction to retry and therefore to require trial *de novo;* while in another, as in Re McVay, 14 Idaho, 56, 93 Pac. 28, to require a trial of exactly the same issues as tried below, on the theory that to try *de novo* is to try anew, to strictly comply with which no new issues must be retried above. While still in ancient Florida cases, with an idea in mind of early procedure by writ of error, the appeal and trial *de novo* thereon is held to be the equivalent of only a review of the record (State ex rel. Pleasure v. McClellan, 25 Fla. 88, 5 So. 600; State ex rel. Chestnut v. King, 20 Fla. 399); and similar constitutional jurisdictional provisions to ours were accordingly interpreted so narrow that to so interpret them would convict the members of our constitutional convention of ignorance of prevailing procedure, and also require the thwarting of legislative will expressed in § 7985, in declaring it to be unconstitutional. This would be as unnecessary as it would be contrary to the present weight of authority.

We conclude, then, the statute assailed as unconstitutional is a valid exercise of legislative power, in that the right of a trial *de novo* in district court on an appeal in probate matters from the county court is but a regulation of the manner of exercise of the appellate jurisdiction conferred upon the district court by an appeal on law and fact.

In the original opinion the costs were taxed against respondent. In so doing we erred, and the order should be modified to the end that the right to tax costs be denied to both parties, appellants and respondents. It is, as respondents urge, that neither party prevailed on the appeal and appellants in fact may never establish their right to share in the estate, or may never appear further in this action; in which event, in failing to recover on the merits, they would be no more entitled to recover judgment for costs of respondents than respondents are entitled under present conditions to recover costs of them. To such extent the

original opinion as filed is hereby modified. Neither appellants nor respondents shall be allowed to tax costs or disbursements herein.

The petition for rehearing is denied.