# IN RE APPEAL OF MINNEAPOLIS, ST. PAUL, & SAULT STE. MARIE RAILROAD COMPANY, a Corporation, CONCERNING AN ORDER OF THE COMMISSIONERS OF RAILROADS OF THE STATE OF NORTH DAKOTA.

(152 N. W. 513.)

The Board of Commissioners of Railroads of this state ordered a separate daily passenger service to be installed on the Ambrose-Flaxton branch of the appellant railway company, which appealed to the district court where the

Note.—In regard to the right to a direct appeal to the courts from a decision of a railroad commission, the authorities, which are reviewed in a note in 49 L.R.A.(N.S.) 565, seem to establish the rule that there can be no appeal except pursuant to constitutional or statutory provision.

Board's decision was affirmed, and it appeals to this court, alleging that the findings are insufficient to support the judgment of the district court. The Board's order was a denial of the railroad's application to be relieved under chap. 200, Sess. Laws 1907, Comp. Laws 1913, §§ 4789–4795, from running a daily passenger service, which had been ordered by the Board. The Board denies the right of the railroad to appeal, asserting that its order is final and that a statute granting a right of appeal would be unconstitutional because administrative, instead of judicial, functions are concerned. Since the decision below was made, this branch line has been extended into Montana. Both parties request a decision on the merits and that the case not be treated as moot. *Held:*—

**Board of Railroad Commissioners — decisions of — appeals — courts.**

1. Though chap. 200, Sess. Laws 1907, Comp. Laws 1913, §§ 4789–4795, did not expressly grant an appeal to the courts, yet as it is *in pari materia* with similar earlier statutes in themselves granting and contemplating generally a right of appeal from decisions of the Board to the courts, a right of appeal exists as to the matters embraced in the statute in question.

**Subject-matter — ligislative — administrative — statutes — appeals — review.**

2. That the subject-matter is legislative or administrative does not render a statute unconstitutional authorizing a review of the action of the Board in the courts on an appeal to them.

**Railroads — passenger train service — relief from — right to apply to Commissioners — permissive statute — discretion of Board.**

3. That the right of the railroad to apply to the Commission to be relieved from maintaining a separate daily passenger service (by installation of a daily mixed passenger and freight service on branch lines) is permissive in language, and not a positive direction to the Board, and vests in it a discretion does not negative a right of appeal.

**Relief — earnings — cost of operation — branch line — statutory exception.**

4. In determining whether such relief shall be granted, the earnings and cost of operation of branch line service must be determined as near as possible, and where it plainly appears that the cost of operating the branch line with separate daily passenger service installed greatly exceeds the railroad's earnings and revenues derivable from the operation of such branch line, the carrier is prima facie within the statutory exception and prima facie is entitled to be permitted to operate a daily mixed passenger and freight train.

**Branch lines — statute revenues — service — cost — investment — dividend on.**

5. The statute granting such relief has particular application to branch lines, and the revenues from service and cost of branch line service only must be considered. The petitioner cannot be compelled to operate a separate daily passenger service on this branch line at a great loss, and be compelled to make up such loss from its main line revenues. The intent of the statute is that the

revenues from branch lines shall justify a daily passenger service independent of whether the railroad as a whole within the state is returning a fair dividend on its investment.

**Passenger service — revenues — express.**

6. The proof discloses that the G. N. Crosby-Berthold line furnishes ample passenger service for four fifths of the length of this Soo branch line. A separate passenger service should not be forced for the convenience alone of the town of Ambrose and vicinity, when to do so will cause an additional annual expenditure of $14,000, added to a loss already sustained under mixed train service, the revenues being inadequate to meet even the expenses of a mixed train service.

**Order — judgment — interstate commerce.**

7. The order and judgment appealed from are reversed. Since trial, this line has been extended into Montana, and questions of interstate commerce may now be involved, which conditions will be taken into consideration in future proceedings had herein.

Opinion filed April 23, 1915.

Appeal from the District Court of Burke County, *Frank Fisk,* J. Reversed and remanded.

*Palda, Aaker, & Greene,* of Minot, *John L. Erdall* and *Alfred H. Bright,* of Minneapolis, of counsel, for appellant.

*W. H. Stutsman,* of Mandan, and *Henry J. Linde,* Attorney General, for respondents, the Commissioners of Railroads.

Goss, J.   This appeal is from the decision of the district court, wherein trial was had on testimony taken relating to an application by the railroad company to the State Board of Railway Commissioners, made under chap. 200 of Sess. Laws of 1907, Comp. Laws 1913, §§ 4789–4795. Mixed train service was given on the Ambrose-Flaxton Soo branch line. In November, 1910, residents of Ambrose petitioned the Board of Railway Commissioners to order installation of separate daily passenger and freight service. On hearing had the petition was granted. The railroad immediately applied to be relieved therefrom, and upon a second hearing had the application of the railroad was denied and an order was entered June 24, 1911, directing installation of a separate daily passenger service. From this order the railroad appealed to the district court of Burke county. The matter came on

for trial as an issue of fact and law on May 30, 1912, and a decision was rendered adverse to the railroad company. It appeals, assigning as error that the evidence is insufficient to justify certain findings entered, and that the findings are insufficient to support the judgment rendered.

This opinion is written after a rehearing had. Prior to rehearing it was held that the order made by the Board of Railway Commissioners, and upon which the appeal was taken to the district court, was non-appealable in that it was merely an order denying the carrier's application to be relieved from the general statutory requirement to run a daily passenger train, instead of an order directing or compelling action in the matter; and for the further reason that no right of appeal was considered as granted by chap. 200 of the Session Laws of 1907, Comp. Laws 1913, §§ 4789–4795, concerning the matters there mentioned, and that the intent of that particular statute was to leave the Board vested with a discretion as to said matters, uncontrolled by resort to the courts by appeal. It was also mentioned in said opinion that the case was moot, inasmuch as this Ambrose branch had been extended into Montana, pending the appeal, and now accommodates a much greater territory.

Undoubtedly this case might be disposed of as moot and the decision be within the law. However, the Board and the corporation desire a decision as precedent for future action.

The legislature has seen fit to declare that both a daily passenger and daily freight train shall be run each way over every railroad within this state, "provided, however, that, if any railroad corporation shall make it appear to the Board of Railroad Commissioners of this state that the business on any line of its road will not justify its operating both the passenger and freight train herein provided for, and said Board shall so order, said company may operate one mixed train on such line each way on every business day in the year for such time as said Board may direct." The order made is appealable, and a review of the action of the Board may be had in the courts and in this court on appeal. Whether the order be merely negative, or on the contrary affirmative action, does not affect the right of appeal. To hold otherwise would allow the right to an appeal to be dependent on the caprice of the Board in the framing of its order. The right is

absolute if granted by the statute, and it is plainly apparent from the codification of the laws pertaining to the powers and duties of the Railroad Commissioners, as codified in chap. 115 of the Session Laws of 1897, that it was the legislative intent that as to all enactments, past and future, unless the contrary was clearly apparent from the future act itself, a right of appeal, retrial, and review should be allowed from the decision of that body to the courts. As nothing contained in chapter 200 of the Session Laws of 1907, Comp. Laws 1913, §§ 4789–4795, manifests a contrary intention, it must be taken as *in pari materia* with similar existing enactment and as having been enacted subject to an understood and generally applicable right of appeal in this as in all other similar and related matters. Lewis's Sutherland, Stat. Constr. 2d ed. §§ 443–448; 36 Cyc. 1147.

The Board of Railroad Commissioners urges that it is a part of the executive department of the state, with functions purely administrative; that the courts have universally established and maintained a sharp distinction between purely administrative acts and those which are purely judicial, relegating one to the executive and the other as belonging to the judicial departments of government respectively. It urges that such distinction here exists pertaining to the acts under review, and that "the judicial department is powerless to control or review the executive department so long as it does not exceed its legal authority;" that if its acts are reviewable at all by the courts, it is only when they are in palpable excess of jurisdiction or power, and that then they are reviewable only on certiorari if at all; and if the power to review by appeal has been granted, the statute attempting to confer it is unconstitutional "for the reason that the courts have no power over a commission belonging to the executive department acting within the scope of its authority." It next contends that certiorari will not lie for a mere excess of jurisdiction exercised, and finally arrives at the conclusion that its acts, because administrative and it constituting a branch of the executive arm of government, are practically wholly beyond judicial review.

The powers and duties of this constitutional Board are not prescribed by the Constitution, but are left to the legislature to create and define. Section 83 of the state Constitution declares that they "shall be as prescribed by law." As well observed in Kermott v. Bagley, 19 N. D.

30 N. D.—15.

345, 124 N. W. 397, the powers of government, although divided generally into three distinct departments, legislative, executive, and judicial, are otherwise undistributed. In other words, our Constitution contains no distributing clause specifically apportioning the three different classes of governmental power. Merely because the duty is administrative, strictly speaking, and nonjudicial in the broad sense of the term, does not bar the legislature from requiring its exercise, nevertheless, by a district court, the constitutional court of general original jurisdiction. Kermott v. Bagley, supra, following Com. ex rel. Carson v. Collier, 213 Pa. 138, 62 Atl. 567. The Constitution does not prevent the legislature (upon which it has imposed the duty of prescribing the powers and duties of the Railroad Commission) from saying that such powers or duties, even though administrative in character, may be reviewable in the district court on appeal, and in which tribunal a trial *de novo* of even administrative issues may be had.

It is immaterial whether the duties of the Board of Railroad Commissioners may be technically legislative or judicial. There is nothing in the Federal Constitution to hinder a state from uniting "legislative and judicial powers in a single hand." Prentis v. Atlantic Coast Line Co. 211 U. S. 210–225, 53 L. ed. 150–158, 29 Sup. Ct. Rep. 67; Dreyer v. Illinois, 187 U. S. 71–84, 47 L. ed. 79–85, 23 Sup. Ct. Rep. 28, 15 Am. Crim. Rep. 253; Winchester & S. R. Co. v. Com. 106 Va. 264–268, 55 S. E. 692; 6 R. C. L. 147); and though in our state Constitution the three departments of government, executive, legislative, and judicial, are primarily separately invested with powers to be so classified respectively, "it is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments." Story, Const. 5th ed. 393. "Again, 'indeed, there is not a single Constitution of any state in the Union which does not practically embrace some acknowledgment of the maxim [separation of the powers of government to be administered by the three arms of government separately], and at the same time some admixture of powers constituting an exception to it.'

Story, Const. 395." Winchester & S. R. Co. v. Com. 106 Va. 264–270, 55 S. E. 692.

The duties of this Board relative to granting permission to discontinue operation of this daily train are legislative. 6 R. C. L. 159. The order made will be prospective in operation, and relate not to past, but to future, matters. It is analogous to the establishing of rates. The inquiry preliminary to determining the rule to be made concerning it is but such as might, with propriety, have been made by a legislative committee. That the inquiry may be reviewed on appeal in court proceedings matters not, as "that question depends not upon the character of the body, but upon the character of the proceedings." Ex parte Virginia, 100 U. S. 339–348, 25 L. ed. 676–680, 3 Am. Crim. Rep. 547; also Prentis v. Atlantic Coast Line Co. 211 U. S. 210–232, 53 L. ed. 150–161, 29 Sup. Ct. Rep. 67, wherein it is held that the fact that an appeal is taken from the Commission to the courts, and a decision given confirming a rate, does not render such decision judicial, instead of legislative, in character. "A state may permit appeals to its courts from the rate-making orders of its Railroad Commission, and upon the review of such orders, it may expressly authorize its judicial tribunals to investigate and decide questions which otherwise would not belong to them, *or even to act legislatively.*" Louisville & N. R. Co. v. Garrett, 231 U. S. 298, at p. 314, 58 L. ed. 229, at p. 243, 34 Sup. Ct. Rep. 48, citing Prentis v. Atlantic Coast Line Co. 211 U. S. 210–227, 53 L. ed. 150–159, 29 Sup. Ct. Rep. 67. Conceding the premise of the Commission, that its acts may be either legislative or administrative, it does not follow that an appeal to the courts from its decisions in such matters cannot constitutionally be granted. Kermott v. Bagley, 19 N. D. 345–350, 124 N. W. 397; Com. ex rel. Carson v. Collier, 213 Pa. 138, 62 Atl. 567. The original exercise of the power is left with the Commission for its administration, and until the appeal the whole legislative power is there, which suffices the test prescribed by constitutional provisions distributing generally the three powers of government to the three arms of government. Winchester & S. R. Co. v. Com. 106 Va. 264, 55 S. E. 692. While duties cannot be imposed upon this court except such as are judicial, under § 96 of the state Constitution, the limitation does not apply to district court original jurisdiction (Kermott v. Bagley, supra); and it is true that the character of the act, as being

legislative or judicial, is determined by the nature of the final act under consideration, yet this proceeding on appeal is but an exercise of appellate jurisdiction, even though concerning administrative subject-matter. Though practically a retrial may be had in this court on the appeal, it does not alter the fact that the jurisdiction exercised is appellate, and the trial in that manner is but one method of exercise of strictly appellate jurisdiction. Christianson v. Farmers' Warehouse Asso. 5 N. D. 438, 32 L.R.A. 730, 67 N. W. 300; Re Peterson, 22 N. D. 480, at p. 505, 134 N. W. 751. The legislature having the authority to vest the courts of general trial jurisdiction with the appellate jurisdiction of the subject-matter, though administrative or legislative in kind, could prescribe a further appellate jurisdiction therefor and vest this court therewith. The constitutional limitation on the supreme court is not on subject-matter, but instead is that the jurisdiction exercised or conferred shall be appellate jurisdiction only; except, of course, in the instance prescribed by §§ 86, 87 of the state Constitution conferring original jurisdiction on this court. The question is rather one of power of the legislature to grant the right of trial and an appeal therefrom.

Along with nearly every power granted, this board is provided a right of appeal to the courts. It is declared that "the district courts of this state shall have jurisdiction to enforce, by proper decrees, injunctions, and orders" its "reasonable rulings, orders, and regulations affecting public right." Comp. Laws, § 4732. Section 4736 not only grants the right of appeal to the district courts, but gives them general power to try and determine all issues, whether of a judicial, administrative, or legislative nature. "The district court shall, upon the hearing of such appeal, receive and consider such evidence as may be adduced by either party, and shall rescind, modify, or alter said order appealed from in such manner as may be equitable and just." Consult also §§ 4744, 4745, a part of the general scheme of review in the courts of such orders.

The weight of the finding of the Board originally made in the matter is a question different from that concerning the power of the courts over the issue on which such findings are offered as evidence. No doubt cases may arise where the findings of the Commission, as is said in Puget Sound Electric R. Co. v. Railroad Commission, 65 Wash. 75, 117 Pac. 739, Ann. Cas. 1913B, 763, reiterated in State ex rel. Great

Northern R. Co. v. Public Service Commission, 76 Wash. 625, 137 Pac. 132, at p. 136, may necessarily be of an expert character and because thereof entitled to great weight, yet the same is not true in the instant case. Courts can satisfactorily determine the issue presented of the reasonableness or unreasonableness of the order made in the light of all the circumstances.

It may be conceded that the legislature could have passed this statute without the proviso, and required daily passenger train service. It had the power to declare such to be the public policy. But it also had the power to declare an exception to be the public policy to be observed, and has done so. Had no exception been made, but a daily train been required, it would not only have been within the power, but it would have been the duty, of the Commission to compel a daily service. With the exception made, however, it is the duty of the Commission to likewise comply with the law and observe the exception. What the Commission might have done had the statute not contained the proviso can furnish no basis for disregard of the proviso, nor make it any the less the statute. That the exception is granted in permissive, rather than in mandatory, language, is immaterial, as it does not signify that it is not its declared policy that, when the facts bring the carrier within the exception, it should enjoy its benefits; nor because it is framed in permissive language does it place the ruling of the Commission beyond appeal and court review.

Now as to merits. The branch line from Flaxton to Ambrose was 51 miles long. Tabulations of receipts and expenditures made, allotted, or apportioned to this line for the three years ending respectively June 30, 1909, 1910, and 1911 are in evidence. During this period mixed train service was given. From freight, passenger, mail, and express, apportioned on a mileage basis, the earnings of this branch show $50,-030, $51,818, and $49,147 per year respectively. It is urged that the apportionment made of these earnings is improper, and does not truly reflect the benefit of the branch to the railroad system as a whole. But of all known methods of apportionment, that on the mileage basis seems most equitable, and has met generally with the approval of the courts. Against these earnings must be charged approximately $22,000 per year for strictly transportation expenses alone, an expense unquestionably disbursed on the branch line in producing its earnings. To this

there must necessarily be added $14,000 per year for taxes of this branch line, another expense equally certain, making a total definite expense from these two items alone of $36,000, which includes no overhead charge, such as maintenance of way and structures, maintenance of equipment, traffic, and general expenses of the general railway system, a proper proportion of all of which upon an equitable basis must be allotted to or charged against this branch line under the holding in Northern P. R. Co. v. North Dakota, 236 U. S. 585, 59 L. ed. —, P. U. R. 1915C, —, 35 Sup. Ct. Rep. 429, just decided by the Supreme Court of the United States, or what is commonly known as the North Dakota Lignite Coal Rate Cases. The Federal court reversed this court partially upon the very proposition now under consideration. Our holding was that "out of pocket costs" in effect constituted the real and actual cost of transportation of the particular commodity in fixing a commodity rate, inasmuch as the overhead charges would continue regardless of any or all business done. The Federal Supreme Court, however, has announced the rule applicable to a commodity (and necessarily applicable as well to the total earnings of a branch line), that in calculating the cost of carriage there must be a proper allocation or apportionment of all overhead charge made and added to the out of pocket costs. The portion of such general overhead charge to this branch line is in excess of $20,000 per year, or about the amount of the local branch line operating expense. This may be, and probably is, somewhat excessive, as ordinarily the ratio of operating "out of pocket" expense to overhead charge is as 60 to 40. Figured on this basis the total expense apportionable to this branch line, exclusive of taxes, will reach between $37,000 and $38,000 per year. When taxes are added in the sum of $14,000 per annum, the total expense exceeds by approximately $2,000 the total revenues of the branch. And these figures are the result of a three-year test, during all of which time mixed passenger and freight service only was given. The testimony is that the addition of daily passenger service, as ordered installed by the Commission, will increase the yearly operating expense $14,000. This would increase the actual deficit or expenses over receipts to about $16,000 per annum. These are our deductions. The railroad's figures are that the deficit will be much greater, approximately $40,000 annually. It is apparent that, if the train service

ordered be installed, it will be at an actual outlay in expense over receipts of at least $1,000 a month. There can be no escape from this fact, any more than there can be any from the further conclusion that the people, the patrons of the road elsewhere, must make good this needless deficit if the order is enforced. And the carrier's property right to a reasonable rate of return on its money invested has been wholly omitted from the foregoing calculations. It has been held that, in prescribing the carrier's duties to the public, a matter that the public may to an extent control, the public may compel a daily passenger service to be rendered wholly independent of expense to the company. This requirement is held valid on the basis of it being a requirement concerning the public service, and a mere incident to the railroad business as a whole. However, the statute in question contains a proviso in effect excusing the company from operating a separate daily passenger and freight service when it "shall make it appear to the Board that the business *on any link of its road will not justify its operating both the passenger and freight train herein provided for."* The statute has reference to a portion, *i. e.,* branch lines, and not the entire railroad system. Whether any particular part of the main line of the system may be segregated and come within the statute is unnecessary to determine. It is certain that the statute has particular reference to branch line service. The portion of this road to be taken in this case for the purpose of placing total earnings against total cost of earnings, to determine whether the traffic will or "will not justify its operating both passenger and freight" service, must be this branch line only. In other words, the statute speaks of the business on branch lines, and hence as to this case contemplates that this branch as the one in question shall be considered separate and independent from the receipts and disbursements necessary elsewhere on the system. When the receipts will not "justify its operating both the passenger and the freight train" daily, mixed trains may be run. The receipts must justify, in a business way, the disbursements occasioned by a daily service. It was but another way of stating that the receipts must be sufficient or nearly so to bear the expense of a daily service. Necessarily some reasonable latitude for judgment and discretion on the part of the Board must be allowed. And such is allowed by the language used. The measure is the "business" done on the particular line. The railroad cannot, as

a matter of strict legal right, refuse to install daily passenger service on the sole ground that to do so would run the total expense above the total income from the branch, as the element of public service which the road is chartered to perform enters into consideration. But in the absence of some strong reason to the contrary, proof that the necessary expense is in excess of total receipts should control the situation, and authorize the conclusion being drawn that the business will not justify such daily service. On proof of these facts the company prima facie justified its failure to install a separate daily passenger service or exonerate itself from so doing.

Of course, this court, like the Board of Railroad Commissioners, has the right to take judicial notice of and consider with the evidence many outside matters throwing light upon the situation. In so doing it is to be observed that, shortly after this branch was built to Ambrose, a rival and competing branch of the Great Northern Railroad was built from Crosby to Berthold. This Flaxton-Ambrose branch parallels the international boundary, running east and west from 3 to 10 miles south of it. For about four fifths of its entire length, or from Crosby down, it is closely paralleled on the south by the Great Northern Berthold branch line. The only territory left solely tributary to this Soo line is that portion between Crosby and Ambrose, and not exceeding 9 miles. A daily passenger service from Crosby to Minot and return via Berthold has been maintained, affording all residents in this territory very convenient passenger service on the Great Northern, the only way to meet which by the Soo would necessitate installing a similar return service from Ambrose to Minot and return. The receipts from this branch show that such competition could but result in added useless expense under conditions as they were when this trial was had. The long and short of the whole proposition is that in a territory capable of sustaining but one line of railroad two have been built, and one or both must suffer the consequences of competition for territory. The reason for the deficit then on this branch is as self-evident as is the fact that the branch will sustain or justify but a mixed freight and passenger service. And the fact, too, that the public as a result of such competitive service is having its wants supplied by the Berthold branch is also inconsistent with any claim of justification that might otherwise be urged for a daily Soo passenger service. This does not apply to Ambrose or the territory

immediately tributary thereto. But it would be unjust to say that an unprofitable passenger service over 50 miles of branch line railroad should be compelled merely to suit the convenience of a town of 500 people and surrounding community, at the most not exceeding in the aggregate 1,000 people, while all other towns on the line are otherwise adequately served, and then, too, when the particular town complaining has the benefits already of a mixed passenger and freight service. To enforce the order made would be to compel an additional expenditure of $14,000 per annum over receipts, where the traffic now will not return the expense it causes, all to suit the convenience of a single small community. Such an order is not "justified," to use the statutory term.

It is easy to understand how the opposite conclusion was reached by the Board of Railway Commissioners and the district court. It is explained by the fifth finding of fact, wherein the court found that the entire mileage of this railroad company in this state is 1,110 miles, producing annual earnings of $4,000,000, and that "there is no evidence that the total mileage of the company in the state is operated at a loss as a whole, or that the earnings of that portion of the mileage of the company within this state are not sufficient to pay a reasonable income upon the sum of money invested in the property and rolling stock of the company within the state." The only purpose of such finding was to allow the court to reason along lines parallel with those heretofore followed by this court in the Lignite Coal Rate Cases, but as this reasoning was recently condemned by the Federal Supreme Court when applied to a commodity or a classification, it must be equally untenable when used as a basis for determining whether or not the income of a branch line is to be treated with reference to the earnings of the whole system within the state. The Federal Supreme Court negatives any such conclusion, and by analogous reasoning we must determine the question as one of receipts and expenditures of the branch line alone. To quote from the recent Federal decision, "The public interest cannot be invoked as a justification for demands which pass the limits of reasonable protection, and seek to impose upon the carrier and its property burdens that are not incident to its engagement. In such a case it would be no answer to say that the carrier obtains from its entire intrastate business a return, as to the sufficiency of which in the aggregate it is not entitled to complain." In the West Virginia rate case,

Norfolk & W. R. Co. v. Conley, 236 U. S. 605, 59 L. ed. —, P. U. R. 1915C, —, 35 Sup. Ct. Rep. 437, decided at the same time as the North Dakota Lignite Coal Rate Cases, Northern P. R. Co. v. North Dakota, 236 U. S. 585, 59 L. ed.—, P. U. R. 1915C, —, 35 Sup. Ct. Rep. 429, the same principle was enforced as to different classes of traffic and freight. By analogy the precedent applies. This branch should not be compelled to operate in a particular manner at a great increase of loss over present cost of operation, because forsooth the railroad can afford to suffer this loss by recouping itself from increased rates of revenue obtained elsewhere, or on its other lines within the state. Nor is such the intent of the statute, as has been observed, it providing that the character of the branch service to be given shall be determined from the proceeds of that branch line, and not from the proceeds of all of the system within the state.

Judicial notice is taken of the fact that this branch has been extended into Montana, and present conditions may warrant a daily passenger service. Questions of interstate commerce may now arise. Suitable allowance will be made for possible changed conditions in any judgment and order to be entered herein. The judgment appealed from is ordered vacated, and the District Court will direct the Board of Railway Commissioners of this state to vacate its order of June 24, 1911, as an order erroneously made, and also direct that said Board may either dismiss these proceedings, or may enter such further order, after full hearing afforded the railway company, as present conditions may in its judgment require and the law permit in the matter herein litigated.

CHRISTIANSON, J., did not participate; Burr, District Judge, sitting in his stead.

BRUCE, J. (dissenting). I am compelled to dissent from the opinion of the majority. The province of this court, as I understand it, is to construe the law, and not to administer it, nor to legislate. This court has no right to ignore the plain and unequivocal language of a valid legislative enactment.

The legislature of North Dakota has ordered (as it had a right to do, and with the wisdom of the enactment we are not concerned) that

daily passenger trains shall be run on the branch as well as on the main lines of the railroads within the state, "provided, however, that if any railroad corporation shall make it appear *to the Board of Railroad Commissioners* of this state that the business on any line of its road will not justify its operating both the passenger and freight train herein provided for, *and said Board shall so* order, such company may operate one mixed train on such line each way on every business day in the year *for such time as said Board may* direct." Laws of 1907, chap. 200, Comp. Laws 1913, §§ 4789–4795. The statute expressly provides that such train shall be run and that the running of daily passenger trains shall be the uniform *public policy* of the state unless the *Board of Railroad Commissioners* (which is an administrative agency intrusted with the general supervision of railroad matters in North Dakota) shall order otherwise. But the majority of this court holds that *it,* and not the *Board of Railroad Commissioners,* may issue such order or grant such excuse. The statute expressly provides that such general policy of daily passenger trains shall prevail unless the railroad corporation "shall make it appear *to the Board of Railroad Commissioners* of this state that the business on any line of its road will not justify its operating both the passenger and freight train herein provided for." The majority, however, holds that if a railroad company makes it appear, not to the *Board of Railroad Commissioners,* but to the *district court, upon a trial de novo and upon evidence totally different from that produced before the commissioners,* that such district court must grant the excuse. It holds in short that, where the legislature says that a matter shall be made *to appear to the Board of Railroad Commissioners,* it means that it shall be made to appear to the *district court* upon a trial *de novo* and upon totally different evidence.

Not only this, but it holds that in case the district court happens to be of the same opinion as the Board of Railroad Commissioners, an appeal even can be taken from its decision, and that if it shall be made to *appear to the supreme court* that such excuse from the operation of daily passenger trains should be granted, the supreme court may grant the same. It holds in short that when the legislature provides that a fact or condition must be made to appear *to the Board of Railroad Commissioners,* it really means that this fact or condition must be made

to appear to the *supreme court.* It would be hard, indeed, to find any other case where a clear legislative enactment has been so distorted and perverted.

The only excuse for the holding of the majority is that an act, which was passed in 1897, and ten years before the enactment of the statute now under consideration, provided for an ap_ _al from orders of the Board of Railroad Commissioners issued under *"the act."* The majority, however, absolutely ignores the fact that this prior act of 1897 nowhere made any provision for the running of passenger trains. It related almost entirely to the regulation of railroad rates and to the orders of the Board of Railroad Commissioners in relation thereto. It made it the duty, it is true, of the Railroad Commissioners to see that the railroads obeyed the laws of the state. It nowhere, however, provided that either the railroads or the Board of Railroad Commissioners could overrule the positive mandates of a future act, nor can it be contended that when it provided for an appeal from orders *regulating rates* it tied the hands of subsequent legislatures, and prevented them from establishing a public policy of *daily passenger trains,* and vesting the responsibility of its carrying out in the discretion of the Board of Railroad Commissioners.

The provision of the act of 1897 (chapter 115) which relates to appeals, is expressly limited in its application. It (§ 32) provides that "any railroad, railroad corporation, or common carrier, subject to the provisions of this act, or any other person interested in the order made by the Commissioner of Railroads, may appeal to the district court of the proper county in the judicial district of this state from which the complaint arose, and which is the subject and basis of the order made by the Commissioners of Railroads *regulating or fixing its tariffs or rates, fares, charges, or classification, or by any other order made by said Commissioners under the provisions of this act."* This limited clause, and in a statute which says nothing about the running of passenger trains and which is interested solely in tariff classifications and rates, and in the general details of railroad operation in relation thereto, is construed by the majority opinion to apply to a statute which is passed ten years later, which provides for a general policy of passenger service, and which provides that the only person or body which can grant an excuse from an observance of such policy is the Board of Railroad

Commissioners.   See Robinson v. Sunderland [1899] 1 Q. B. 751, 68 L. J. Q. B. N. S. 330, 80 L. T. N. S. 262, 63 J. P. 341, 19 Cox, C. C. 245, 15 Times L. R. 195.

When the discretion of granting such an excuse is, by chapter 200 of the Laws of 1907, Comp. Laws 1913, §§ 4789–4795, vested exclusively in the Board of Railroad Commissioners, and then only in case certain facts are *made to appear to them,* can it be said that it was the intention of the legislature that new evidence should be introduced in the district court, and that that court should be vested with the power to hold that that *was* made *to appear* to the Board of Commissioners, which *did not in fact appear to them,* and that in case of a holding of that court which was adverse to the railroad company an appeal could again be taken to this tribunal and that we could say the same thing? Is it not clear that the general policy of the state, as announced by chapter 200 of the Laws of 1907, Comp. Laws 1913, §§ 4789–4795, was a policy of daily passenger service, unless the Board of Railroad Commissioners (which is an administrative branch of the government and which is intrusted with the duty of subserving the interests of all parties concerned) should be satisfied that the business of the branch line did not justify the expense, and that in that event an excuse should be granted *for a limited time? Does this court, we may now ask, assume the power to fix the limits of that time?* Is it not also clear that the writer and subscribers to the majority opinion have confused the rights of the railway company which arise under statutes which regulate rates with those which arise under statutes which merely relate to the method of the operation of its lines? Are they not influenced in their decision by a feeling that the operation of a passenger train on the line in question would be an unprofitable venture, and that the railway company should by some means be protected against loss? Do they not absolutely ignore the fact that the railway company has its remedies, and that, even if it had not, they have no right to themselves usurp legislative functions? "There is," says the Supreme Court of the United States in Missouri P. R. Co. v. Kansas, 216 U. S. 262, 54 L. ed. 472, 30 Sup. Ct. Rep. 330, "a difference between the exertion of the legislative power to establish rates in such a manner as to confiscate the property of a public service corporation by fixing them below a remunerative standard and one compelling the corporation to render a

service which it is essentially its duty to perform; and an order directing a railroad company to run a regular passenger train over its line, instead of a mixed passenger and freight train, is not, even if such train is run at a loss, a deprivation of property without due process of law, or a taking of private property for public use without compensation; nor is such an order an unreasonable exercise of governmental control."

The reason for this rule is that the charter of every railroad corporation must be deemed to have been granted upon the theory of public service, and that the road will really serve the public. On no other theory, indeed, can the right of eminent domain, which is universally conceded to railroad companies, be justified. It lies also in the fact that the railroad corporation has a remedy against confiscation in the right and power to charge rates that will compensate it and guarantee to it a reasonable profit after meeting all of the requirements of the state in regard to service. Having this power to insist upon an adequate compensation, and to demand rates which will be commensurate to the duties imposed, it cannot complain if the public, for reasons of basic convenience or of public safety, demands passenger, rather than mixed, trains.

Independently of statute and under its charter, it is the duty of the railroad company to carry passengers, as well as freight. Having this duty, and even in the absence of a statute, it is its duty to furnish reasonable conveniences and a reasonably safe method of transportation for such passengers. "It cannot be said that the carrier of passengers in a car attached to a freight train is a suitable and proper operation of a railroad, as far as the carriage of passengers is concerned. The transportation of passengers on a freight train, or on a mixed train, is subordinate to the transportation of freight, a mere incident to the business of carrying freight. To furnish such cars as are necessary for the suitable and proper carriage of passengers involves the necessity of adopting that mode of carrying passengers which is best adapted to secure their safety and convenience. This can be accomplished better by operating a separate passenger train than by operating a mixed train." People ex rel. Cantrel v. St. Louis, A. & T. H. R. Co. 176 Ill. 512, 35 L.R.A. 656, 52 N. E. 292.

This must be universally conceded. In fact it needs no evidence to

show that from the standpoint of public safety, to say nothing of speed or convenience, there is no parallel between a freight or mixed train and a strictly passenger train. Is not this the clear policy which is announced by the legislature? It is a self-evident fact that the interests of the railway companies and of the public are one. We have adopted the theory of quasi public corporations. We have given to the railway companies extraordinary rights, such as eminent domain. They are also essentially businesses which are "clothed with a public interest," which are to a greater or lesser extent monopolies, and which are, therefore, subject, even under the common law, to legislative control. Munn v. Illinois, 94 U. S. 113, 24 L. ed. 77.

On the other hand, the constitutional provisions which forbid a deprivation of property without due process of law and the general spirit of fair play in the community, as well as the economic fact that no man or corporation can, for a long period of time, be induced or compelled to operate at a loss, have given rise to the rule that they can in all cases insist upon a fair return for the capital which is reasonably invested and on the reasonably economical administration of their property, and that this right cannot be taken from them by the legislature. This rule, of course, implies that, though the public may impose duties upon the railway company, and may insist that its needs be reasonably served, yet that when these requirements impose an additional cost upon the corporation, it may reimburse itself in the form of added rates, so that the total result will be a reasonable profit on its enterprise. On this theory and as a last analysis, the public themselves pay for insisting upon added requirements or upon an obedience to the duties imposed in the first place by the charter of the company; for it is perfectly clear that every new expense which is imposed upon the railroad company, whether in the form of adequate service or in the form of taxes, is ultimately paid by the traveling and freight consuming public, as such expenses only tend to elevate the point which divides loss and profit, and to raise the point where a reasonable profit is exceeded and the public may insist upon a reduction of rates. Northern P. R. Co. v. Richland County, 28 N. D. 172, L.R.A. 1915A, 129, 148 N. W. 545. The Board of Railroad Commissioners, therefore, are intrusted with the duties of subserving the interests of both the railroad companies and of the public. Among those duties (and imposed by chapter 200 of the

Laws of 1907, Comp. Laws 1913, §§ 4789–4795) is the duty to determine whether the business of a branch line really justifies the imposing upon the railway company, as well as upon the public, the increased cost of passenger service, or rather whether or not the loss is so apparent that they should excuse the railway company *for a limited period of time* from complying with the provisions of the general law, which require the running of such trains and the incurring of such expense. This is purely an administrative function, and is clearly made so by the act of 1907, and there is no justification nor excuse for attempting to limit that act by claiming that there is an appeal from the discretion of such Commission, which appeal is not provided for in the act in question, and which is sought to be based on the provisions of a statute which was passed ten years before and which has no connection whatever with the statute under consideration.

The plaintiff railway company is, as a matter of fact, entitled to but little consideration in this particular controversy, though of course, as the rule which is announced by the decision is far reaching, it and the general public are entitled to the fullest consideration of the questions involved. It at no time has complied with the provisions of the statute, and much of the confusion which is apparent in the record, and in the opinion of the majority, I believe is due to this fact. It has delayed for many years a decision in a matter which long ago should have been settled. The act of 1907 provides for a general policy of passenger service. It provides that passenger trains shall be run unless an excuse is granted, and then that that excuse shall only be "for such time as said Board may direct." It presupposes the institution of that service in the first instance. I do not say that the railway company should necessarily have immediately instituted the service after the law became operative and applicable to it, but I do say that, if it did not do so, it *should have immediately applied to the Board of Railroad Commissioners for the excuse.* Instead of doing this, the railway company, however, has never attempted to comply with the statute, and it made no application to the Board of Railroad Commissioners to be excused from such compliance until the road had been in operation for some years and until the Board of Railroad Commissioners had been compelled to issue an order requiring it to comply with the provisions of the statute. It now seeks to avoid the provisions of the statute which vests the exclusive discretion

as to the granting of such permission or excuse in the Board of Railroad Commissioners by appealing from the order which requires it to obey the law, and which necessarily must be valid unless, in the first instance, it had obtained such excuse. It may be that such order is appealable, but on such appeal it can only be shown that the railway company was not actually within the state and subject to the jurisdiction of the Board, or that, as a matter of fact, the passenger train was in operation, or that the Board of Railroad Commissioners had, for some other reason, acted outside of its jurisdiction.

The railway company cannot, by appealing from such order, accomplish the same results as if it had appealed, and an appeal had been allowed by the statute, from the refusal of the Commissioners to grant the excuse. It, it is true, tried the two matters together, and the record is greatly confused, but the fundamental fact still remains that the only defense to the order was the alleged fact that the Board of Railroad Commissioners did not grant the excuse and should have done so. But this decision was not reviewable in the district court, and is not reviewable here.

I fully agree with the conclusion of the majority that it was the intention of the legislature that it was the business of the branch line, and not of the railway company as a whole within the state, that should justify the operation of the passenger train. In other words, that it was this criterion that should be adopted by the Board of Railroad Commissioners. The matter, however, with this general rule or criterion as a guide, was left to their discretion. I should also add that there is serious doubt in my mind as to whether the evidence offered by the railway company was in any way competent and controlling. When I say that, in my opinion, it was the business of the branch line that should justify the incurring of the expense of the daily passenger service, I do not mean that in every instance a branch line should show a profit on the basis of its mileage, for in many instances a branch line is but a feeder, and though but a few miles in length may be the origin of hundreds of miles of long distance freight or passenger transportation, and become in this way the source of a large revenue, which is entirely disproportionate to its length. The proof of the railway company was defective in this respect. Instead of showing what the branch line really furnished in the way of business, it apportioned *its receipts*

30 N. D.—16.

*to the branch line on the basis of the mileage of that line.* If this theory be adopted, I believe I am safe in saying that there is hardly a paying branch line in North Dakota. It must, however, be clear to all that a branch line, though short in its mileage, may open up a pocket of grain or of coal, or other freight or passenger traffic. That grain or coal is carried for a few miles over the branch line and then is carried for many hundreds of miles over the main line for which service the company is compensated. A branch line, in short, may be a feeder and the basis of a large revenue, not because of its mileage, but because it furnishes the material for hundreds and even thousands of miles of through transportation. There is hardly a carload of wheat, for instance, that stops at the end of the branch line and does not go on to Duluth or to Minneapolis, or even to Chicago. In any view of the case the Railroad Commissioners can hardly be said to have abused their discretion when they failed to grant the excuse upon the proof that was furnished. It can hardly be said that it *must* have satisfactorily appeared to them that the branch line was not a paying line. I am of the opinion that the judgment of the district court should be affirmed.

BURR, D. J. (dissenting). I reach the same conclusion as Justice Bruce. The issue involved is this: Has the railway company the right of appeal from the action of the Board of Railroad Commissioners in refusing permission to be relieved from the observance of the provisions of § 4789 of the Compiled Laws of 1913 ? The Board of Railroad Commissioners is a part of the executive department of this government; free from the control of the judiciary, unless such control is given by the Constitution and the law. It is true the powers and duties of the Board "shall be as prescribed by law" (Const. § 83) ; but this does not presuppose appeal to the courts. The right of appeal must be clearly defined,—there is no presumption in its favor,—and unless jurisdiction to revise these acts is given to the courts, it does not exist. As Justice Bruce has pointed out, the section relied on as granting appeals from orders of the Board is not applicable. In addition to the fact that the matter involved here was not in the contemplation of the legislature when § 4736 was enacted, there is this feature,—the evidence of the action of the Board of Railroad Commissioners is not an order in that sense. The fact that an order is in the negative is not the question,—

there is no order here within the meaning contemplated, simply a refusal to grant permission. It is immaterial what it may be called. The Board is not requiring the railway company to do or not to do a certain thing,—the law requires the company to run the passenger trains. It is the duty of the company to do so. The legislature recognized that this may entail expense and loss which could only be compensated by an increase in rates, and made provision whereby one part of the executive department may waive compliance with this section, provided the railway company "makes it appear to the Board" that the business does not justify this expenditure *and the said Board shall so order.* There is no analogy between the provisions of this section and the control of rates. Primarily the carrier controls the rates. It is its road and its business. Only to prevent injustice does the state interfere. The so-called "Lignite Cases," in the United States Supreme Court, show this. But the requirement to run trains is an entirely different matter. It is conceded the state has the right, from the very first, to insist on this action, and has placed with the administrative department the power of waiving compliance. The duties prescribed and orders made pursuant to the provisions of § 4736 have no relation to this matter. This section is part of chap. 115 of the Session Laws of 1897, and is entitled, "An Act to Regulate the Transportation of Passengers and Property by Common Carriers; . . . to Provide for the Control thereof, in the Matter of Rates to be Charged for Such Transportation and the Manner thereof, to Define the Powers and Duties of the Commissioners of Railroads." The right to appeal, as given by the provisions of this chapter, is the right to appeal from any order "regulating or fixing tariffs of rates, fares, charges, or classifications, or from any other order made by said Commissioners *under the provisions of this act."* Section 4789 is part of chapter 200 of the Session Laws of 1907, entitled: "An Act to Regulate the Operation of Passenger and Freight Trains of Railway Lines in This State." This act in form is not an amendment to chapter 115 of the Session Laws of 1897, nor does it refer to such a chapter or to the act therein stated. It is a separate and distinct act, and so far as the first section is concerned (§ 4789 of the Compiled Laws) it is an entirely different matter. The last paragraph of this new act of 1907 says: "Nothing in this act contained shall in any manner be construed as repealing or in any manner altering any other act, or part of act, hereto-

fore adopted by the legislature of this state, but the remedies herein provided shall be cumulative to all other remedies now existing." It is clear from this § 7 that chapter 200 is intended to be additional to chapter 115 of the Session Laws of 1907, Comp. Laws 1913, § 8729, and any control given therein, or declaration made, is additional to chapter 115 of the Session Laws of 1897. Therefore, the provisions of chapter 115 of 1897 Laws, with reference to appeals from the orders of the Commissioners, should not be extended to chapter 200 of Session Laws of 1907, Comp. Laws 1913, §§ 4789–4795, unless the nature of the subject-matter treated is so connected with chapter 115 of the Session Laws of 1907, Comp. Laws 1913, § 8729, as to be construed an amendment. The judicial does not control the other departments of the government, unless the power is given explicitly,—not by implication.

Then again the expression "made to appear to the Board of Railroad Commissioners" is broader than judicial discretion—it is analogous to personal satisfaction. The Board alone can say whether it is *made to appear* to the Board. The Legislature desired the opinion and judgment of the Board on the question whether it would be better in certain cases to permit a waiver of what the state has a right to insist on, or have the company raise its rates. It is not a question of arbitrary power, although this is always involved, even in the decision of cases. The number of times the question may be reviewed does tend to justice; but the final determination must be somewhere. The legislature has seen fit to confide to the Board the power of saying whether the state will waive its right to insist on running of daily passenger trains. It is a matter of grace on the part of the state, not a matter of right to which the road is entitled when it brings itself within the limit. The railway may present a strong showing why it should be permitted to substitute a mixed train, and I believe it has, but the Board may, in its judgment, think it better to require this service to the public even though it merely suits the convenience of a town of 500 inhabitants. This is a matter which appeals to the legislature, and it is the judgment of the Board the legislature desires. It must be made to appear to the Board, and not to the courts. It may be asked, What is to be done in case the Board acts arbitrarily? The answer is found in Worman v. Hagan, 78 Md. 152, 21 L.R.A. 720, 27 Atl. 616, where the court says: "It would not be becoming in this court to suppose that such a contingency would

ever happen. The courtesy due to the executive department forbids us to entertain such conjecture. But if, unhappily, in future times, it ever should occur, assuredly a sufficient remedy will be found. The resources of a free government are ample, and will always be found adequate to punish and redress offenses against its sovereignty." But the company is not injured in any way. The law does not compel the road to do business at a loss, and the facts and figures set forth appear to be beside the question, except so far as they appeal to the judgment of the Board in determining whether it be better to substitute mixed trains for a time and thus save expense, or have a readjustment of schedules with all of the attendant trouble and delay. This matter can be adjusted readily. Primarily, the carrier fixes its own rates. Laws fixing too low rates are frequently declared confiscatory, and therefore this element of hardship and injustice is not involved. As Justice Bruce has pointed out, the state, as an incident to its sovereignty, has a right to require the service, and the company must accede. The company has the right to fix remunerative rates, however, and if the state, in insisting on its rights of adequate service to the public, requires action which increases expense, the added rate will not be controlled unless it is unreasonable. The legislature has seen fit to place this power with the Board, and, as after noted, did not contemplate appeal therefrom.

There are special features involved here. The railway company is asking a review of the judgment of the Board of Railroad Commissioners, but the review is based on matters not before the Board, if the contention of appellant be correct. How can it be said that the railroad "makes it to appear to the Board" when the Board denies the request on the showing before it? The courts may have new evidence regarding rates,—this is a matter where the state cannot interfere unless the railroad is guilty of injustice and the interference is aimed to secure justice. In this situation cited the Board is the first agency, and appeal to the courts is given; but the question at issue in that case is one where the company has the primary right to fix its own rates. In the case at bar we are concerned with a matter where the state has the absolute right to require the service. The company claims conditions have so changed, through the extension of the road, etc., that now the Board should relieve it. This contention comes with very poor grace. The

law was passed in 1907. Concededly, it has never been complied with. The state has a right to require the service, and it is the duty of the company to obey. The company, without any attempt to comply and after years of violation, at a time when action was being taken to compel its compliance, asked to be excused. The Board of Railroad Commissioners, in its wisdom, denied the request, and now, having extended its line and changed conditions, the appellant says the judgment of the Board should be overruled and permission given because the conditions existing at the time the Board acted have changed.

In Robinson v. Sunderland [1899] 1 Q. B. 751, the question before the court involved the judgment or decision of a local authority in regard to matters where the statute authorized such local authority to do certain things if it appeared to such authority necessary, and in that case, Channell, J., says: "The words, 'appear to such authority,' are obviously put in for the purpose of making the local authority the judges on the question. . . . It depends upon the opinion of the local authority, not upon the fact of sufficiency or insufficiency. It cannot possibly be a matter for the justices to decide; they can only inquire in this respect whether [or not] in the opinion of the local authority, there is a sufficient. . . . They may also inquire, I think, whether the local authority have taken the proper procedure—whether they have done everything which is made by the statute a condition precedent to the right to enter."

And in the same case, Lawrence, J., says: "The decision of that question rests with the local authority. When they have arrived at the conclusion that the premises are not in a proper condition, the justices have no power to interfere with it." It seems to me clear, therefore, that where the personal judgment of the Commission is involved, there can be no appeal therefrom, and this must have been the legislative intention.

The matter is far reaching. If the district courts and the supreme court may review the action of the Board in denying or granting requests to substitute mixed trains for passenger trains for such seasons as may be desired, then the statute involved is rendered practically nugatory. The long process to be used before final determination becomes, in effect, a bar. Of course, if this be the method prescribed by law, then the courts must give effect to it; but such a construction should not

be placed on this section unless it clearly appears to be the only proper one. The nature of the acts suggests this. The law contemplates merely a temporary suspension, speedily granted and speedily rescinded as the season of the year may justify, and the suspension must be for a definite time. From time to time the legislature prescribes the duties and powers of the Board, and states whether appeal to the courts lies. In enacting § 4789 the legislature could have readily provided for appeal. The fact that no appeal is provided for in this act is presumptive that none was intended, particularly when we view the nature and scope of the power vested in the Board. Had not power to relieve from the duties been vested in the Board, the company would be compelled to operate the trains in question, and would have no recourse to the courts in this matter. Why there should be appeal, in the absence of express provision, when the state says we will give the Board power to waive our rights when certain conditions are made to appear to the Board, does not appear clear, especially when we view the temporary nature of the permission to be granted. The construction given by the majority opinion will greatly cripple the effectiveness of the Board, and as the conditions which would guide the Board in granting or refusing permission are changeable and variable in their nature, by the time the courts have finally determined the judicial discretion of the Board in such requests, the judgment of the Board might vary the action first contemplated, and thus by appeals to the courts such delay may be occasioned that the very conditions justifying the Board in refusing permission may have so changed by the time the courts are through taking testimony that the Board itself, on a new application, may come to a different conclusion. The law recognizes the element of changing conditions, and places finally with the Board the power of adjusting the requirements to the conditions, in order that the public may be served and the company be uninjured. It may be claimed that this is one of the powers of the Board, and the powers are subject to review by virtue of the provisions of § 4736. Section 4789 is not a part of the article included in the language of § 4736, and the language of § 4736 should not be construed so as to control the acts of the administration, unless the legislature has explicitly shown such construction to be intended, and I respectfully suggest that this has not been done. I therefore believe the judgment of the district court should be affirmed.