Cunningham, P. J.
Defendant in error, to whom we shall hereafter refer as plaintiff, brought her aetion for divorce and alimony and had judgment. She admits that no marriage ceremony was ever performed or attempted, hence she relies entirely upon what is known as a common law marriage. The record discloses that the alleged agreement of the parties to become husband and wife took place, if at all, at a time when,,by virtue of a statutory marriage, plaintiff was the wife of one John Gordon. Thereafter plaintiff obtained a divorce from Gordon, but no new contract was ever entéred into between plaintiff and defendant subsequent to said divorce; this,, plaintiff admitted. On cross-examination she was .asked the following questions and made the following answers:
*534 “Q After the decree of divorce [meaning her divorce from Gordon] was granted, on April 14th, 1910, state whether or not anything was said between you and Peery about intending to live together as before?
A. No, we lived together just the same.
Q. Was anything said about it?
A. No, sir.”
Plaintiff attempted on trial to explain her conduct by saying that when she met the defendant she supposed that Gordon was dead, and that she had been so informed. Her testimony on this point, as on many others, was inconsistent and wholly unworthy of belief. The records of the County Court of Denver show that she brought the divorce action against Gordon, alleging desertion, non-support and cruelty, and in her affidavit for publication of summons in that cause she stated that she had made search for Gordon through various fraternal orders, and otherwise, without being able to locate him. Moreover, she admitted on the stand, in this case, that none of her family, except a brother who had died, knew that Gordon was dead. She appears not to have been estranged from her family, who resided in Iowa, and whom she visited at least twice during the period covered by her relations with Peery. She testified thtat Gordon was “just such a looking man as Peery.” While visiting with her people in Iowa she wrote numerous letters to defendant, and always addressed him as J. D. Gordon (mailing her letters thus addressed to defendant’s box number in Denver), and she signed her letters, where she signed her full name, as “Nora Gordon.” She admitted that she desired her people to think that Peery was Gordon, and she so introduced him to a sister who once accompanied her from Iowa to Denver, and remained a few days in the latter city. Her explanation for this unusual conduct was that her folks were Catholics, and that Gordon was a Catholic, but that Peery was not a member of that church, and, apparently, she was unwilling *535 to have her relatives know that she had married a protestant. At least this was her sole explanation.
Prior to the institution of this action defendant had entered into a statutory marriage with another woman whom he had known from her childhood, and with whom he continued to live, and with whom he was living as husband at the date of the trial of this cause.
Aside from the unsatisfactory evidence that plaintiff and defendant had lived together as husband and wife, to which we shall presently allude, the only evidence of a contract of marriage between them was the testimony of the plaintiff herself — no third party being present when she claims same was entered into. Nor was there any direct evidence that defendant ever admitted having entered into such a contract. In his answer and on the trial he denied having done so.
Plaintiff’s attempt to prove a contract of marriage by general reputation in the community in which she claims that she and defendant resided resulted in a compelte failure. For the purpose of establishing a marriage by general reputation plaintiff introduced but three witnesses, although she testified that she and defendant had lived together as husband and wife in three different rooming, houses in the City of Denver. One of these witnesses was a child nine years of age at the date of the alleged transactions to which she testified; the second witness was a woman who ran various rooming houses in the City of Denver, in which plaintiff lived, while the third was a grocer with whom plaintiff traded for a short time, having her account charged in her name as Mrs. Peery. There was no evidence whatever that the defendant knew that plaintiff was running such an account, and no evidence that he paid the same. The grocer had never seen defendant, and knew nothing whatever concerning his relations with the plaintiff. The landlady referred to admitted that she had never had any introduction to the defendant, and had never spoken to him, but *536 she testified that she had seen him enter her house occasionally, usually (if not always) in the evening, and had heard him talking in plaintiff’s room, but she gave no testimony indicating what defendant said on those occasions. The little girl may have spoken to defendant, though that does not clearly appear. She had seen him in plaintiff’s room on two or more occasions, and had once heard him refer to the plaintiff as “mamma.” The little girl had a mother and several older sisters, and an older brother, all of whom lived in the same house, and on a lot adjoining the premises where plaintiff claims defendant lived with her, as her husband, for several months. None of the older members of the little girl’s family were called as witnesses, although all of them were living in Denver, the place of the trial, on the day of the trial. The trial occurred in February, 1914, three years after the time of the transactions concerning which the child testified. The rooming house where plaintiff claims she and defendant lived on the occasion of which the little girl and the landlady testified, was filled with roomers, yet none of these roomers were called as witnesses, although at least one of them was living in Denver at the time of the trial. No witnesses were called from two of the three rooming houses in which plaintiff testified that she had lived with the defendant as his wife.
None of the letters written by plaintiff to defendant, which were introduced in evidence, contained anything which indicated that she regarded herself as the wife of the defendant, while they contain much indicating that she did not so regard herself. She seems never to have addressed him as her husband; on the contrary, as we have already said, she addressed him as “Gordon.” Some of these letters were written and mailed in Denver to defendant during the time plaintiff testifies that they were living together in said city as husband and wife. In these letters she usually, if not always, urged the defendant to come to see her, and upbraided him for not doing so. Plaintiff admitted that she *537 had received various letters from defendant when he was out of the city, and when she was out of the city, but she produced none of these letters, although she admitted that sbe had not destroyed them. She also testified that she had received letters from various friends living in Denver when she was visiting her family in Iowa, but she produced none of these letters.
The landlady, whom she called as a witness, had known her for many years prior to her alleged marriage to defendant, and testified positively that she knew plaintiff as “Nor* Gordon” a year before the date of plaintiff’s marriage to Gordon. She fixed the date with great precision and much certainty, and there is nothing-in the record to contradict her testimony in this behalf, since the plaintiff admitted that she had known Gordon for eight years before she was married to him, although she knew none of his relatives.
Plaintiff complained to an officer of the Juvenile Court of Denver of defendant’s conduct. Said complaint resulted in the arrest of defendant on the charge of failure to support his illegitimate child — the child of plaintiff. She consulted a firm of attorneys as to a damage suit against defendant, and they-wrote to him saying that “Mrs. Nora Gordon has consulted with us in regard to your relations with her,” etc. From this it would seem clear that she did not represent to this firm of attorneys whom she consulted that she was the wife of defendant or that her name was Peery.
While on the stand plaintiff stated that she had never been married prior to her marriage with Gordon, but later she admitted that Gordon was her second husband; that she was married in Nebraska to a man by the name of Guggenheimer before she married Gordon. According to her testimony both Guggenheimer and Gordon died shortly after her marriage to them, the former in less, than a month and the latter in about three months.
So far as the evidence discloses, -plaintiff and defendant were never seen together outside the four walls of the vari *538 ous rooms which she rented and paid for, and but three witnesses at most, plaintiff included, saw them together at . all. To no one did defendant ever introduce plaintiff as his wife, nor is there any evidence that she ever introduced him as her husband, and no witness was called who had ever known the defendant personally.
Defendant introduced two witnesses, husband and wife, who had known him for many years. Both of these witnesses testified that he roomed at their home during the period that plaintiff testified she and defendant were living elsewhere as husband and wife. There was nothing whatever to indicate that the testimony of these witnesses was not entirely credible. Indeed, one of them was not subjected to any cross-examination whatever. Defendant introduced a large number of receipts covering his room rent, which the woman where he roomed testified that she had written, signed and delivered to defendant in payment for his room rent. She further testified that she knew he occupied his room regularly, for she cared for the same.
There is nothing in the record disclosing the age of either the plaintiff or defendant,, but the evidence clearly indicates that plaintiff was a woman of mature years, since she was married to Guggenheimer in the spring of 1907 and to Gordon a year later. According to her own testimony she knew Gordon at the time she was the wife of Guggenheimer, and according to the testimony of her chief witness, the landlady, she was known as “Nora Gordon” at the time she claims to have been the wife of Guggenheimer. Plaintiff’s family appears to have lived all the time in Iowa, yet she admitted that she had lived in Denver for about ten years prior to the trial, or Since about 1904. Plaintiff, the evidence shows, had traveled much; therefore, it cannot be inferred that she was a woman of tender years or one without experience.
We agree with the announcement made in the opinion, In re Rossignot’s Will (Sur.), 112 N. Y. Supp., 353, that *539 “evidence to establish á common law marriage should be clear, consistent and convincing.” Especially is this so where the result of establishing such marriage would lay the ground for a crimnal prosecution of either of the parties to the marriage for bigamy, and would invalidate a subsequent marriage wherein all of the statutory provisions had been observed.
It is manifest that plaintiff’s claim of marriage to Peery rests entirely upon her own testimony and the testimony of her two witnesses with reference to general repute. Concerning the nature and character of evidence necessary to sustain the contention of general reputation, the following has been said:
“The general reputation in the community where the parties resided as to whether or not they are husband and wife is competent evidence as tending to prove marriage. It is in the nature of a verdict of the community upon their relations, arrived at from observing their conduct, their manner of life, their deportment toward each other and the community, and their declarations. It is the general impresión or belief created in the minds of the people from those things which constitutes the general reputation, which may be shown in evidence as tending to raise the presumption of marriage or the contrary. To be of any value as evidence such refutation must be general amd uniform.” (Italics ours.)
Weidenhoft vs. Primm, 16 Wyo. 340, 94 Pac. 453. In re Peterson’s Estate, 22 N. D. 480, 134 N. W. 751, it is said: “The repute, to have its fullest effect, should be uniform.”
We have no doubt whatever that the record of this case wholly fails to support plaintiff’s claim that a common law marriage existed between herself and defendant. Indeed, her own testimony, as we read it, would have justified the trial court in directing a verdict against her. The following cases from our own courts are in some respects appli *540 cable and tend to support the conclusion at which we have arrived:
Henry vs. McNeal, 24 Colo. 456, 50 Pac. 37; Taylor vs. Taylor, 10 Colo. App. 303, 50 Pac. 1049; Klipfel's Estate vs. Klipfel, 41 Colo. 40, 92 Pac. 26, 124 Am. St. 96.
The judgment of the trial court is reversed, with instructions to enter a judgment dismissing the case.

Reversed with directions.