714 P.2d 866

**Ronald L. VANDEVER (Deceased)**
**Cynthia K. Vandever (Widow)**
**Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Phoenix Newspapers,**
**Respondent Employer,**

**Gab Business Services,**
**Respondent Carrier.**

**No. 1 CA–IC 3337.**

Court of Appeals of Arizona, Division 1, Department A.

Nov. 21, 1985.

Review Denied Feb. 19, 1986.

Eaton, Lazarus, Dodge & Lowry, Ltd. by Carlos R. Castro and Susan G. Sendrow, Phoenix, for petitioner.

Dennis P. Kavanaugh, Chief Counsel, Industrial Com'n of Arizona, Phoenix, for respondent.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.C. by David W. Earl, Phoenix, for respondent Carrier and Employer.

## OPINION

GREER, Presiding Judge.

The issue presented for our determination in this Industrial Commission special action is whether petitioner established the existence of a valid Colorado common-law marriage so as to be entitled to widow's death benefits under our workers' compensation laws. We hold that there is substantial evidence supporting the decision of the administrative law judge and affirm the award.

### I. FACTS

On October 29, 1983, Ronald L. Vandever was shot and killed while performing his duties as an employee of respondent Phoenix Newspapers. Petitioner Cynthia K. Vandever's claim for compensation as decedent's widow was denied by the Industrial Commission. Petitioner filed a timely request for hearing protesting the denial of her claim. A formal hearing was held and her claim was again denied in a decision dated November 16, 1984. The decision denying benefits was affirmed pursuant to a request for review and petitioner filed this special action.

The following facts regarding the relationship of petitioner and the decedent are

drawn from the record and the uncontroverted testimony given at the administrative hearing. In 1976, decedent began working for respondent Phoenix Newspapers in Ajo, Arizona. Petitioner moved to Arizona in 1973 and obtained a divorce from a former spouse in March, 1976. She was introduced to the decedent in April and immediately thereafter, the couple began living together in the Phoenix area. The couple recited marriage vows to each other during the course of a friend's wedding ceremony the following month, but failed to obtain a license or otherwise comply with the formalities of a valid marriage contracted within the state as set forth in A.R.S. § 25–111.[1] Thereafter, petitioner used the name of Vandever, gave birth to two children, and continued to cohabit with the decedent.

In August, 1978, petitioner and the decedent traveled to Colorado for three weeks with their seven-month old daughter Melissa in order to attend the wedding of the decedent's nephew, Stephen Houser. Petitioner testified that she and the decedent were introduced as Mr. and Mrs. Vandever and as husband and wife to several people at the rehearsal dinner, wedding and reception. Her testimony was corroborated by Stephen Houser, who testified that he and his relatives introduced petitioner and the decedent as Ron and Cindy Vandever. Houser further confirmed that his wedding album was signed "Ronald, Cindy and Melissa Vandever" and that an article regarding his wedding, published in a local newspaper, listed "Mr. & Mrs. Ronald Vandever and Melissa of Ajo, Arizona" as guests in attendance. Houser testified that he never really knew whether the petitioner and decedent were legally married and did not press the issue.

After the wedding, petitioner and decedent stayed in the Houser apartment for three weeks while the newlyweds were on their honeymoon. Petitioner testified that during their stay decedent unsuccessfully sought employment in the Grand Junction area. Finally, petitioner testified that at some point during the three-week vacation the couple heard a radio broadcast on the subject of Colorado common-law marriage and concluded that they were in fact married under the laws of that state.

In January of 1979, decedent resigned from his Ajo, Arizona position with respondent Phoenix Newspapers. The couple returned to Colorado for two weeks where decedent again unsuccessfully attempted to obtain employment in the Grand Junction area. Decedent and petitioner traveled on to New Mexico for a month and a half, and finally settled in Wyoming for thirteen months. In mid-1980, decedent accepted a position offered by the respondent Phoenix Newspapers in Casa Grande, and the couple returned to Arizona where they resided until the decedent's untimely death in 1983.

## II. ANALYSIS

■ In a workers' compensation proceeding, the burden is on the claimant to establish all of the elements of her claim. *Russell v. Industrial Comm'n*, 104 Ariz. 548, 456 P.2d 918 (1969); *Gamez v. Industrial Comm'n*, 114 Ariz. 179, 559 P.2d 1094 (App.1976). The concept of marriage under the workers' compensation statutes is not special, but follows the ordinary domestic relations law of this state. *Gamez*. Therefore, in order to qualify as a widow under A.R.S. § 23–1046, petitioner had the burden of establishing that she and decedent were validly married under Arizona law. *Id.* Petitioner does not argue that a marriage was validly contracted within this state in accordance with the statutory requirements set forth in A.R.S. § 25–111. Rather, it is her position that a common-law

1. A.R.S. § 25–111 provides:
   A. A marriage may not be contracted by agreement without a marriage ceremony.
   B. A marriage contracted within this state is not valid unless:
   1. A license is issued as provided in this title, and

2. The marriage is solemnized by a person authorized by law to solemnize marriages, or by a person purporting to act in such capacity and believed in good faith by at least one of the parties to be so authorized.

marriage was validly contracted in Colorado. Although a common-law marriage cannot validly be contracted within this state, we will recognize a common-law marriage if validly contracted under the laws of another jurisdiction. *In Re Estate of Trigg*, 102 Ariz. 140, 426 P.2d 637 (1967); *Grant v. Superior Court*, 27 Ariz.App. 427, 555 P.2d 895 (1976). Recognition of such marriages is authorized by A.R.S. § 25–112(A), which provides that "[m]arriages valid by the laws of the place where contracted are valid in this state."

◼ The dispute in this case centers on the meaning of the word "contracted." It is the respondents' position that a common-law marriage is "contracted" in the state where the relationship has its origin and is consummated. Respondents argue that because the couple resided in Arizona and began cohabiting as husband and wife in Arizona that we should apply the law of this state rather than that of Colorado in determining whether the marriage was validly "contracted." In essence, respondents' approach incorporates into A.R.S. § 25–112 a choice-of-law analysis that would require this court to discern which state has the most significant contacts with the relationship before honoring a common-law marriage that has been validly contracted under the laws of a sister state. We cannot agree with this line of reasoning.

It is unquestionably the general rule, as embodied in A.R.S. § 25–112, that a marriage valid in the state where contracted or celebrated is valid everywhere:

> Marriage is primarily a contract. In its constitution it is purely personal and consensual. Considered merely as a contract, it is valid everywhere if entered into according to the *lex loci.* This is the common-law rule. The statute [A.R.S. § 25–112] recognizes the common-law rule, 'all marriages valid by the laws of

the place where contracted shall be valid in this state.'

*Horton v. Horton*, 22 Ariz. 490, 494, 198 Pac. 1105, 1107 (1921).[2] Justifications for the rule include predictability and the interstate order arising from society's interest in marriage. *Horton; see generally*, Leflar, *American Conflicts Law* § 220 at 445 (3d ed.1977).

The exceptions to this general rule are extremely limited and include only the strongest of public policy considerations. *See Restatement (Second) of Conflict of Laws* § 283(2) comment k at 238 (1971). The only marriages validly contracted in another jurisdiction that are denied recognition in Arizona are those involving the marriage of persons with a certain degree of consanguinity. A.R.S. § 25–101 provides:

> *Void and prohibited marriages.* Marriage between parents and children, including grandparents and grandchildren of every degree, between brothers and sisters of the one-half as well as the whole blood, and between uncles and nieces, aunts and nephews and between first cousins, is prohibited and void.

A.R.S. § 25–112(C) provides:

> Parties residing in this state may not evade the laws of this state relating to marriage by going to another state or country for solemnization of the marriage.

These statutes embody the exclusive grounds upon which we will deny recognition of an otherwise valid foreign marriage.[3] As stated by our supreme court in *Horton* :

> The legislature undoubtedly had the power to enact what marriages shall be void in this state, notwithstanding their validity in the state where celebrated, whether contracted between parties who were in good faith domiciled in the state where the ceremony was performed, or between parties who, being domiciled in this state,

---

**2.** *See generally,* Scoles & Hay, *Conflict of Laws* § 13.5 at 421 (1982); Stumberg, *Conflict of Laws* 279–80 (3d ed. 1963); Ehrenzweig, *Conflict of Laws* 377 (1962).

**3.** For an example of the application of our marriage evasion legislation, *see In Re Mortenson's Estate,* 83 Ariz. 87, 316 P.2d 1106 (1957).

left the state for the purpose of avoiding its statutes and married. But the legislature has not seen fit to do so.... If our views shall be found inconvenient or repugnant to sound principles, it may be expected that the succeeding legislature will explicitly enact that marriage contracted within another state by parties who have left this state for the purpose of avoiding its laws, and who return and live here, shall be of no force in this state.

22 Ariz. at 495–96, 198 Pac. at 1107.[4]

■ The fact that petitioner and the decedent may have been domiciled in Arizona simply does not preclude petitioner from establishing that a valid common-law marriage was contracted in another jurisdiction.[5] In ascertaining the validity of a common-law marriage, we must look to the law of the state where the marriage is alleged to have been contracted and not to the law of the domiciliary state, absent extreme public policy considerations such as those set forth in A.R.S. § 12–101. This is not to say that the couple's contacts with Colorado or lack thereof is an unimportant issue in this case, only that such contacts must assume importance, if at all, under Colorado law, not our own.[6]

Having disposed of respondent's statutory argument, we turn to the question of whether petitioner established the existence of a valid Colorado common-law marriage.

■ "By the statutes of Colorado, marriage is declared to be a civil contract; and there is only one essential requirement to its validity, between parties capable of contracting, viz. the consent of the parties." *Taylor v. Taylor*, 10 Colo.App. 303, 50 Pac. 1049 (1907). Evidence of cohabitation and repute, while not essential to the legality of the relationship, is competent and in itself properly may be the basis for inferring consent to a contract of marriage. *Moffat Coal Co. v. Industrial Comm'n*, 108 Colo. 388, 118 P.2d 769 (1941); *In Re Peters*, 73 Colo. 271, 215 Pac. 128 (1923); *Deter v. Deter*, 484 P.2d 805 (Colo.App.1971). Thus, if a contract or agreement cannot be shown, its existence may be proven by, and presumed from, evidence of cohabitation and general repute. *Taylor; Klipfel's Estate v. Klipfel*, 41 Colo. 40, 92 Pac. 26, 28 (1907). It is necessary that there be evidence of both before a common-law marriage will be presumed; proof of one alone is not sufficient to sustain the presumption. *Klipfel* at 28. A presumption of marriage by cohabitation and repute can only be established by evidence that is convincing and positive, *id.* at 29, or that is clear, consistent and convincing. *Employers Mut. Liab. Ins. Co. v. Industrial Comm'n*, 124 Colo. 68, 234 P.2d 901 (1951).

The *Taylor* court defined cohabitation and general reputation as follows:

'Cohabitation,' as here used, means something more than sexual intercourse ... 'It is not a sojourn, nor a habit of

4. *Horton* involved a resident of Arizona who obtained a divorce in Maricopa County and subsequently traveled to New Mexico in order to remarry and avoid an Arizona statute prohibiting remarriage within one year of divorce.

5. *Travers v. Reinhardt*, 205 U.S. 423, 27 S.Ct. 563, 51 L.Ed. 865 (1907); *Cook v. Carolina Freight Carriers Corp.*, 299 F.Supp. 192 (D.Del. 1969); *Gallegos v. Wilkerson*, 79 N.M. 549, 445 P.2d 970 (1968). *See generally*, Leflar, *American Conflicts Law*, § 220 at 447 (1977): "The validity of so-called common-law marriages accomplished by cohabitation and agreement without formal ceremony ... is determined by the law of the place where the acts, or the last act, purporting to constitute the marriage, occurred. Normally, there will be no difficulty in deciding

where the significant act or acts occurred, even in the case of purported common-law marriage where cohabitation and related conduct occurred in successive states. The first of such states which says that the local conduct created the marital status is the one in which the parties got married."

6. We therefore disagree with the legal reasoning of cases which hold that the policy of the domicile disfavoring common-law marriages should govern unless the couple has subsequently established residence in a state recognizing such marriages. These cases effectively read a requirement of residency into the law of all common-law marriages states which may or may not exist. *See, e.g., In Re Binger's Estate*, 158 Neb. 444, 63 N.W.2d 784 (1954).

visiting, nor even a remaining with for a time. None of these fall within the true idea of cohabitation as a fact presumptive of marriage ... To cohabit is to live or dwell together, to have the same habitation; so that, where one lives and dwells, there does the other live and dwell with him ...' By 'general reputation or repute' is meant the understanding among the neighbors and acquaintances with whom the parties associate in their daily life that they are living together as husband and wife, and not in meretricious intercourse. 'In its application to the fact of marriage, it is more than mere hearsay. It involves, and is made up of, social conduct and recognition, giving character to an admitted and unconcealed cohabitation.'

50 Pac. at 1049–50. What is meant by "general reputation" was more closely examined in *Peery v. Peery*, 27 Colo.App. 533, 150 Pac. 329 (1915):

'It is in the nature of a verdict of the community upon their relations, arrived at from observing their conduct, their manner of life, their deportment toward each other and the community, and their declarations. It is the general impression or belief created in the minds of the people from those things which constitute the general reputation which may be shown in evidence as tending to raise the presumption of marriage, or the contrary. *To be of any value as evidence such reputation must be general and uniform.*'

(Emphasis theirs.) 150 Pac. at 331.

Although we apply the substantive law of Colorado in determining whether petitioner was in fact married to the decedent, we apply Arizona law in order to define the appropriate standard of review. *Krisko v. John Hancock Mut. Life Ins. Co.*, 15 Ariz.App. 304, 488 P.2d 509 (1971). An Industrial Commission award will not be set aside by this court on review unless, as a matter of law, there is no reasonable basis in the evidence upon which the Commission could have reached its conclusion. *In Re Estate of Bedwell*, 104 Ariz. 443, 454

P.2d 985 (1969); *Reynolds Metal Co. v. Industrial Comm'n*, 22 Ariz.App. 349, 527 P.2d 308 (1974). In deciding whether the Commission's award is reasonably supported by the evidence, we will construe the evidence in a light most favorable to sustaining the award. *Malinski v. Industrial Comm'n*, 103 Ariz. 213, 439 P.2d 485 (1968).

We cannot say on the basis of the record before us that the Industrial Commission award denying widow's benefits to petitioner was wholly unreasonable. The only evidence tending to establish the existence of an actual agreement or contract made in Colorado was the uncontradicted testimony of petitioner to the effect that the parties mutually decided they were married after listening to a radio broadcast. There is evidence in the record tending to cast doubt on the credibility of petitioner as a witness. We have frequently stated that an administrative law judge's assessment of the credibility of witnesses is generally binding upon the reviewing court. *Adams v. Industrial Comm'n*, 710 P.2d 1073 (Ariz.App.1985); *Koval v. Industrial Comm'n*, 23 Ariz.App. 277, 532 P.2d 549 (1975). Therefore, we find no error in the administrative law judge's failure to find that petitioner's uncontradicted testimony standing alone was sufficient to establish the existence of a contract. Furthermore, we do not believe that the petitioner presented clear and positive evidence of both cohabitation and general repute in Colorado so as to establish a presumption that such an agreement existed. The only evidence presented as to the couple's behavior in Colorado was the testimony of petitioner and Stephen Houser regarding their behavior during the wedding, a single event. This evidence was hardly "general and uniform" within the meaning of *Peery*, and was not sufficiently clear and positive so as to raise a presumption of the existence of reputation of marriage in the community under Colorado law. *See Employers Mut. Liab. Ins. Co. v. Industrial*

*Comm'n,* 124 Colo. 68 234 P.2d 901 (1951); *Peery v. Peery,* 27 Colo.App. 533, 150 Pac. 329 (1915).[7] As noted by H. Clark, Jr., *Law of Domestic Relations* § 2.4 at 56 (1968):

> [P]roof of a common-law marriage under modern cases requires evidence of a course of conduct, of marital cohabitation. *At the least, this would entail a stay of some duration in the nondomiciliary state before evidence of the requisite kind and amount could become available.*

(Emphasis supplied.) [8]

We therefore find that the administrative law judge could reasonably have concluded that petitioner failed to carry her burden, and affirm the award of the Commission denying widow's benefits under the workers' compensation laws.

BROOKS, J., and DAVIS, J. Pro Tem., concur.

NOTE: RICHARD DAVIS was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. Art. VI, § 3 and A.R.S. §§ 12–145–47.

---

**7.** *See also, In Re Enoch's Estate,* 52 Ill.App.2d 39, 201 N.E.2d 682 (1964) where the Illinois court held that two weeks in Colorado plus testimony that the petitioner had introduced decedent as her husband while in the state was insufficient to establish a valid Colorado common-law marriage.

**8.** *See also, Grant v. Superior Court,* 27 Ariz.App. 427, 555 P.2d 895 (1976); *In Re Estate of Bivi-*ans, 98 N.M. 722, 652 P.2d 744 (App.1982). *But see, Bloch v. Bloch,* 473 F.2d 1067 (3d Cir.1973); *Metropolitan Life Ins. Co. v. Holding,* 293 F.Supp. 854 (E.D.Va.1968) and cases cited therein, holding that where the law of the state recognizing common-law marriages does not prescribe a minimum period of residence, a few days may suffice to establish a valid common-law marriage.